## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW MEXICO

JASON R. WHITE,

       Plaintiff,

v.                                               Civ. No. 12-0988 MV/KBM

CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE OFFICER
J. McRAE, in his official and individual
capacity; ROBERT METZGER (sic), J.
RICHARDS, John Doe,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on City Defendants Jeremy McRae and Joshua Richards' Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint, and Memorandum in Support ("McRae and Richards' Motion for Summary Judgment"), filed December 13, 2013 [Doc. 60], Defendant Robert Metzgar's Motion for Summary Judgment Based on Qualified Immunity and Supporting Memorandum ("Metzgar's Motion for Summary Judgment"), filed December 13, 2013 [Doc. 64], and Defendant Jeremy McRae and Defendant City of Albuquerque's Motion for Summary Judgment Requesting Dismissal of Count V of Plaintiff's Complaint—Supervisory and Municipal Liability ("Supervisory and Municipal Liability Motion for Summary Judgment"), filed December 13, 2013 [Doc. 61]. The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that McRae and Richards' Motion for Summary Judgment is well taken in part and will be granted in part, Metzgar's Motion for Summary Judgment is well taken in part and will be granted in part,

and the Supervisory and Municipal Liability Motion for Summary Judgment is well taken in part and will be granted in part.

## **BACKGROUND**

I.     Procedural Background.

On September 20, 2012, Plaintiff Jason R. White filed an unverified complaint asserting claims pursuant to 42 U.S.C. Section 1983 against Defendants arising out of his on September 23, 2009, investigative detention and subsequent arrest for the crimes of assault on a peace officer, resisting arrest, and disorderly conduct.   Plaintiff alleges that Defendants McRae, Richards, and Metzgar in their individual capacities violated Plaintiff's Fourth Amendment constitutional rights to be free from unlawful investigative detention and arrest, his Fourth Amendment constitutional right to be free from excessive force, his Fourth and Fourteenth Amendment rights to be free from malicious prosecution, and his First Amendment right to be free from arrest in retaliation for recording and photographing the police.   Plaintiff further asserts supervisory claims against Defendant McRae as well as municipal liability claims against Defendant City of Albuquerque premised on the alleged constitutional violations committed by the individual defendants.

On December 13, 2013, Defendants filed McRae and Richards' Motion for Summary Judgment, Metzgar's Motion for Summary Judgment, and the Supervisory and Municipal Motion for Summary Judgment.   In their motion, McRae and Richards seek dismissal with prejudice of all of Plaintiff's individual capacity claims against them on the ground that qualified immunity shields them from the Section 1983 claim for unlawful detention because, to the extent the encounter was not voluntary, Defendants had reasonable suspicion to investigate Plaintiff and probable cause to arrest him, and because the constitutional right allegedly infringed was not

clearly established.   In addition, McRae and Richards argue that they are entitled to qualified immunity from the Section 1983 malicious prosecution claim because they had probable cause to support the arrest and the original action did not terminate in Plaintiff's favor, and because the constitutional right allegedly infringed was not clearly established.   McRae and Richards also contend that they are shielded by qualified immunity against the Section 1983 claim for retaliatory arrest because First Amendment expression is subject to reasonable time, manner, and place restrictions and because the alleged First Amendment right was not clearly established.   Finally, McRae and Richards argue that they are entitled to qualified immunity against the Section 1983 claim for excessive force because Plaintiff's injuries were de minimis and the force they used was objectively reasonable under the circumstances, and because the right allegedly infringed was not clearly established.

In Metzgar's Motion for Summary Judgment, Metzgar argues that the Court should dismiss all of Plaintiffs' individual capacity claims against him with prejudice on the ground that he is entitled to qualified immunity from the Section 1983 claim for unlawful detention because it was Defendant McRae, and not Metzgar, who initially placed Plaintiff in handcuffs during the investigative detention, and because McRae's actions of detaining and handcuffing Plaintiff were reasonable.   Metzgar next argues that he is entitled to qualified immunity from the unlawful arrest claim because the facts demonstrate that Metzgar had probable cause to arrest Plaintiff.   Metzgar also contends that he is entitled to qualified immunity from the malicious prosecution claim because Plaintiff has not alleged facts indicating that Metzgar lacked probable cause to conduct the original arrest.   Metzgar further argues that he is entitled to qualified immunity from the

retaliatory arrest claim[1] because Plaintiff has not alleged facts which demonstrate that he was arrested without probable cause and because the facts do not establish that Metzgar's actions were substantially motivated as a response to Plaintiff's exercise of his First Amendment rights. Metzgar last maintains that he is entitled to qualified immunity from the excessive force claim because the force he used was reasonable under the circumstances.

In their Supervisory and Municipal Liability Motion for Summary Judgment, Defendants McRae and the City of Albuquerque seek dismissal with prejudice of Plaintiff's supervisory and municipal liability claims against them. Specifically, McRae asks the Court to dismiss the supervisory claims against him in his individual capacity on the ground that he is shielded by qualified immunity because no underlying constitutional violation occurred. The City of Albuquerque asks the Court to dismiss the municipal liability claims against it on the ground that no underlying constitutional violation occurred and on the ground that, even if it had, Plaintiff has failed to produce evidence indicating that a municipal policy or custom that was the moving force behind the violation or that the City acted with deliberate indifference.

On December 30, 2013, Plaintiff filed a response entitled, "Plaintiff Jason White's Response to Defendant Robert Metzger, Jeremy McRae, Joshua Richards, Eric Martinez, John

---

[1]   Defendant Metzgar notes that Plaintiff has not formally brought a Section 1983 First Amendment claim premised on retaliatory arrest against him, but nonetheless addresses the claim in the event the Court were to construe Plaintiff's complaint as bringing a First Amendment claim against him. [Doc. 64 at 13]. Plaintiff's First Amendment claim is found in a state court complaint that Plaintiff attaches to his federal complaint and that state complaint does not allege that Metzgar is liable for that count. [*Id.*]. Plaintiff does not address the question whether he asserts a First Amendment retaliatory arrest claim against Metzgar in his opposition to Metzgar's Motion for Summary Judgment. Because Defendant Metzgar raises the argument, and Plaintiff has not denied he brings a First Amendment claim against Metzgar, the Court construes the complaint as bringing such a claim and therefore addresses the merits of Metzgar's Motion for Summary Judgment on that claim.

Doe, Chief Ray Schultz Motion for Summary Judgment Requesting Dismissal Of Plaintiff's Claims on Qualified Immunity." [Doc. 67]. The Court construes the response liberally and assumes that the response, which indicates in its title that it opposes Defendants' request for dismissal on qualified immunity grounds, serves as a response to the two motions brought solely on qualified immunity grounds—namely, McRae and Richards' Motion for Summary Judgment and Metzgar's Motion for Summary Judgment—and to the Supervisory and Municipal Liability Motion for Summary Judgment to the extent that motion seeks dismissal of the supervisory claims against McRae on the ground that he is shielded by qualified immunity. Plaintiff does not attach to his response an affidavit or sworn declaration containing his description of the events leading up to and following his arrest or otherwise refuting the facts set forth by Defendants. Rather, Plaintiff makes many assertions of fact in the body of his response, none of which are under oath, in attempt to demonstrate that the facts identified by Defendants are in dispute. In addition to filing his initial response to the motions, Plaintiff filed three additional responses opposing the qualified immunity motions for summary judgment. [Docs. 68, 78, 89].

II.    Factual Background.[2]

On September 23, 2009, the manager of the Lotus nightclub, which is located in downtown Albuquerque, New Mexico, flagged down Defendant McRae, a supervisory officer holding the position of commander at the Albuquerque Police Department. [Doc. 60 at 1]. The manager directed McRae's attention to a black, Mercedes Benz sedan parked on a public street in front of the nightclub, in which a male, later identified as Plaintiff, had been sitting for 45 minutes in the

---

[2]   Except where otherwise noted, the following facts are undisputed or construed in the light most favorable to Plaintiff.

driver's seat "staring" at "underage" girls.   [*Id.* at 2; Doc. 60-6].   McRae attests that the manager was concerned because the Lotus nightclub was hosting an event for individuals eighteen years and older and he thought that Plaintiff was suspicious and may have been waiting to pick up an "unsuspecting" female patron.   [Doc. 60; Doc. 60-1 at 2, 9].

Plaintiff denies, in an unsworn statement in the body of his initial response to the motions for summary judgment, that he was staring at anyone outside of the night club.   Plaintiff states that "[t]here were many people standing outside male and female," and that he "was paying little to no attention to the crowd."   [Doc. 67 at 8].

Defendant McRae attests that as he approached Plaintiff's vehicle, he noticed that it had a temporary tag with an expiration date in November 2009, which McRae noted was more than 30 days from the date on which he encountered Plaintiff.   [Doc. 60 at 2].   McRae asserts that, based upon his experience, it is uncommon for a temporary tag to display an expiration date past 30 days of purchase.   [*Id.*].

McRae attests that he was unable fully to see Plaintiff inside of the vehicle because the windows were tinted dark and the driver's side window was rolled down a few inches.   [Doc. 60 at 3].   Plaintiff disputes that the windows were tinted dark in the body of his initial response and attaches photographs of his vehicle.   [Doc. 67 at 7].

McRae asked Plaintiff to roll down his window so that McRae could have a clear view of Plaintiff's hands.   [Doc. 60 at 3].   McRae asserts that Plaintiff became upset, muttered what sounded like an obscenity, and refused to adjust the position of the window.   [*Id.*].   Defendant McRae then ordered Plaintiff to roll the window down.   [*Id.*].   Plaintiff did not comply and instead yelled, "What do you want?"   [*Id.*].   McRae asserts that he drew his firearm and

6

positioned it in the low-ready position, called for back-up officers to assist him, and ordered Plaintiff to step out of the vehicle. [*Id.* at 3-4]. Plaintiff asserts in the body of his initial response that McRae pointed his gun at Plaintiff's head and not in the low-ready position. [Doc. 67 at 9]. Plaintiff initially refused to comply with McRae's order, but once two other officers arrived on the scene, Plaintiff exited the vehicle as ordered. [*Id.* at 4; Doc. 64-3; Doc. 60-1 at 11]. The Court, construing the facts in the light most favorable to Plaintiff, concludes that the officers arriving on the scene at that time included Defendant Metzgar initially, and, soon thereafter, Defendant Richards.[3]

McRae maintains that after exiting, Plaintiff exhibited hostile body language, clenching his fist and tensing his body. [Doc. 60 at 4]. McRae asserts that McRae thereafter holstered his firearm but nonetheless handcuffed Plaintiff because McRae was concerned for his own safety and the safety of the other officers on the scene. [*Id.*].

McRae attests that he next obtained Plaintiff's driver's license and Defendant Metzgar ran Plaintiff's identifying information through the NCIC database. [*Id.*; Doc. 64-2 at 1]. The search revealed a hazard warning for law enforcement personnel because Plaintiff had a record of battering police officers. [*Id.*; Doc. 60 at 4]. The search otherwise indicated that Plaintiff's license was valid and that no warrants had been issued for Plaintiff's arrest. [*Id.*]. Richard Bradberry, a security officer for the Lotus nightclub, reports that McRae, Richards, and Metzgar

---

[3] This construction is consistent with the criminal complaint filed by Defendant Metzgar, in which Metzgar concedes that it was he, as well as McRae, who conducted the "initial investigation" of Plaintiff, and with the complaint and his affidavit, in which Metzgar admits that it was he who ran Plaintiff's identification through the National Crime Information Center ("NCIC") database. [Doc. 60-6; Doc. 64-2 at 1]. The construction is also consistent with Defendant Richards's affidavit, in which Richards admits that he arrived during McRae's pat-down search of Plaintiff, which occurred just after Plaintiff exited the vehicle. [Doc. 60-4 at 1].

"then checked [Plaintiff] out and found that he was supposedly waiting on friends to go to the club."   [Doc. 60-1 at 11].

Defendant McRae asserts that, because there were no warrants for Plaintiff's arrest, McRae instructed an officer to remove Plaintiff's handcuffs.   [*Id.* at 5].   Thereafter, McRae attests that Plaintiff immediately began walking up to all of the officers, standing within inches of their faces, and writing down the officers' names.   [*Id.*].   Plaintiff asserts in the body of his initial response that he asked police for their badge numbers and names, but the officers covered their badges and stated that they did not have to provide Plaintiff with this information.   [Doc. 67 at 10].

McRae attests that Plaintiff then began searching inside of his vehicle, produced a large cell phone, walked up to McRae with the phone, and pointed the phone, only inches away, at McRae's face in an aggressive manner.   [*Id.*].   Defendant Metzgar reports that Plaintiff "walk[ed] towards Lt. McRae in a fast and determined manner and put his camera phone approximately 1½ feet away from his face in a violent manner as if to possibility strike [McRae]." [Doc. 60-6 at 1].   McRae attests that he was "fearful that [Plaintiff] was going to batter [him] so [McRae] told [Plaintiff] that he was under arrest since [Plaintiff] had just assaulted [him]."   [Doc. 60-1 at 4-5].   McRae also attests that he also was concerned for his safety because McRae had received trainings and safety bulletins warning officers of a recent trend of disguising firearms in everyday objects such as cell phones.   [Doc. 60 at 5].

Defendant McRae asserts that he ordered Plaintiff to put the cell phone down but Plaintiff refused to comply.   [Doc. 60 at 6].   McRae then attempted to grab the cell phone from Plaintiff. [*Id.*; Doc. 60-1 at 4].   McRae contends that Plaintiff physically resisted McRae's attempts to retrieve the phone by pushing McRae away while firmly holding onto the phone.   [Doc. 60 at 5].

8

McRae attests that he then informed Plaintiff that he was placing Plaintiff under arrest because Plaintiff was resisting and assaulting McRae.   [Doc. 60 at 5].

Defendants Metzgar and Richards joined McRae in the attempt to restrain Plaintiff and the three officers fell to the ground while struggling to restrain Plaintiff.   [Doc. 60 at 5; Doc. 64 at 7]. McRae asserts that because Plaintiff continued to resist the officers' attempts to place Plaintiff's arms behind his back for handcuffing, officers utilized the face-down stabilization technique to attempt to bring Plaintiff to the ground.   [Doc. 60 at 5].   This technique is utilized to prevent and/or limit a person from physically resisting so that the person can be placed safely in handcuffs and involves placing a person in the prone position and using pressure control techniques on the individual's arms and legs.   [*Id.* at 6-7].   Richards attests that it was McRae who attempted to utilize the face-down stabilization technique to place Plaintiff in handcuffs after Plaintiff shoved the cell phone in McRae's face.   [Doc. 60-4 at 2].   In contrast, Metzgar asserts that it was he who, after "observ[ing] [Plaintiff] raise his arm at [McRae]," "grabbed [Plaintiff] around the upper shoulders and escorted him to the ground and placed him in a face down stabilization technique." [Doc. 60-6 at 1; *see also* Doc. 64-2 at 2].

McRae attests that Plaintiff continued to resist their efforts to restrain him using the face-down stabilization technique.   [Doc. 60 at 7].   McRae and Richards assert that Metzgar then utilized his taser and contact-tased Plaintiff in the stun drive mode to force Plaintiff to comply with their attempts to restrain him.   [*Id.*; Doc. 60-4 at 2].   According to McRae, Plaintiff continued to resist.   [Doc. 60 at 7].   McRae then ordered Plaintiff to stop resisting and instructed Metzgar to use his taser again.   [*Id.*].   Defendants assert that Metzgar continued use his taser against Plaintiff while Plaintiff was resisting, but stopped using his taser once officers had managed to handcuff

Plaintiff.   [*Id.*: Doc. 64-2 at 2].   McRae and Richards attest that Richards assisted in the process by grabbing one of Plaintiff's arms in attempt to handcuff him.   [Doc. 60 at 7; Doc. 60-4 at 2]. McRae and Richards further assert that after officers handcuffed Plaintiff, Plaintiff continued to resist, so officers placed Plaintiff in a Passive Restraint System (PRS) to further limit his mobility. [Doc. 60 at 7; Doc. 60-4 at 2].

Although Plaintiff concedes that he retrieved his cell phone from his car and started taking pictures of the police officers, Plaintiff denies in the body of his response that he resisted the officers.   [Doc. 67 at 10].   Plaintiff further asserts in his response that when he started taking pictures of the officers, for the purpose of being able to identify them because the officers were withholding their names and badge numbers, the officers objected and informed Plaintiff that he could not photograph them.   [*Id.*].   Plaintiff states that the officers then attacked him and attempted to obtain the cell phone from him because they did not want Plaintiff to take photographs of them.   [*Id.*].   Specifically, Plaintiff maintains that three officers tackled him, began striking, kicking, and twisting his legs, ankle, arms, and slammed his head into a rust-iron grate inlayed in the sidewalk's concrete causing his forehead to become cut and "gush" blood. [Doc. 67 at 3-4].

After the officers succeeded in handcuffing Plaintiff, they obtained written statements from Lotus nightclub employees Steven Machson, Jon Chavez, and Richard Bradberry.   [Doc. 60-4 at 7].   The statements of Chavez and Bradberry indicate that Plaintiff resisted police attempts to place him under arrest.   [Doc. 60-1 at 10, 11].   Chavez states that "police attempted to constrain [Plaintiff] and [Plaintifff] continued to resist for the next 15-20 minutes," and that "during the incident [Plaintiff] was tased and continued to struggle and resist the officers."   [*Id.* at 10].

10

Bradberry asserts that after placing Plaintiff under arrest, officers "attempted to restrain [Plaintiff] and he began to resist," that "two other officers tried in vain to restrain [Plaintiff] and he fought not to be restrained," that Plaintiff continued to resist and "berate and fight" after he "finally went down on the ground," and that Plaintiff "had to be tazzered [sic] and handcuffed."   [*Id.* at 11].

McRae attests that after Plaintiff was in the PRS, McRae noticed that Plaintiff had an abrasion on his head from the struggle and that McRae instructed an officer to call rescue to the scene to treat Plaintiff.   [*Id.*].   McRae attests that the only other visible injury from the struggle was a scrape on Plaintiff's knee.   [*Id.* at 8].   Plaintiff, however, disputes this contention and presents medical records to support his claim.   [Doc. 68 at 14-26].   These reports indicate that Plaintiff sought medical attention two days after his arrest, that he reported to physicians that as a result of the force used by Defendants McRae, Richards, and Metzgar, he fell and twisted his left ankle and landed on his arm, and that Plaintiff reported having his head smashed into the ground several times.   [*Id.* at 22].   Plaintiff also reported pain in his left ankle, pain in his left elbow on pronation of the forearm, pain in his head, and a concern that his laceration was infected.   [*Id.*]. The medical reports indicate that the laceration on Plaintiff's head was two inches long and that Plaintiff had several other abrasions around his head and scalp, that Plaintiff had tenderness and abrasions on his back, bruising in the antecubital fossa of his left arm, bruising and abrasions on both legs, and swelling of his left ankle.   [*Id.*].

McRae attests approximately ten to fifteen minutes elapsed from the time that Defendant McRae first approached Plaintiff's vehicle until the time an officer released Plaintiff from handcuffs.   [Doc. 60-1 at 5].   Plaintiff was handcuffed for approximately five to eight minutes of this time.   [*Id.*].   Plaintiff contends in his opposition brief that he was handcuffed for close to 30

minutes.   [Doc. 67 at 10].

Plaintiff was charged by Defendant Metzgar with the crimes of assault on a peace officer, resisting arrest, and disorderly conduct, but the charges subsequently were dismissed.   [Doc. 60 at 8].   Defendants maintain that the charges were "dismissed pursuant to an agreement that Plaintiff obey all laws and have no new charges within 90 days of May 14 [sic], 2010."   [*Id.*].   In support of this contention, Defendants cite the Metropolitan Court file case history notes entered on May 4 and September 4, 2010.   [*Id.*].   The notes state that on May 4, 2010, "Parties agree – 90 day [White] – obey all laws no new charges," and that on August 4, 2010, "[White] in COMPL [compliance] – dismi[ss] case w/ prej."   [Doc. 60-7].   Next to the notes are the initials of the person writing the note, presumably the state prosecutor.   [*Id.*].   Plaintiff White's signature or initials are nowhere on the notes.   [*Id.*].   Plaintiff asserts in his response to the motions for summary judgment that he did not agree to comply with any conditions in exchange for dismissal of the claims against him.   [Doc. 67 at 11].

The City of Albuquerque has a policy in the Standard Operating Procedures ("SOP") manual which requires officers who have graduated from the police academy to undergo training on at least an annual basis.   [Doc. 61-1].   The City of Albuquerque also has a policy in the SOP manual which provides that each police officer fulfill the duties of his/her assignment and obey the orders of his/her superior officers.   [Doc. 61-2].   The City of Albuquerque Police Department also has a Personnel Code of Conduct which requires personnel to obey all lawful orders of a supervisor.   [Doc. 61-14].

The City of Albuquerque has a policy in the SOP manual that sets forth supervisory positions within the Albuquerque Police Department, [Doc. 61-2] that provides that "a supervisor

is a superior officer or professional employee who supervises and directs the activities of personnel assigned to them," [Doc. 61-5], and that sets forth the duties and responsibilities of superior and commanding officers over subordinate officers, [Doc. 61-3; Doc 61-4].   The City of Albuquerque also has a policy in the SOP manual which states that the Internal Affairs Unit is responsible for investigating allegations of misconduct by department personnel.   [Doc. 61-6]. The City of Albuquerque Police Department has an "Early Warning System" ("EWS") that is a proactive system intended to enhance awareness for potential problem employees.   The emphasis of the EWS is on training and counseling.   It operates as a tool to identify employees who have shown a propensity for involvement in incidents of potential misconduct.   [Doc. 61-7].

The City of Albuquerque Police Department has a policy which provides guidelines to officers under what circumstances which they may conduct warrantless searches and seizures in accordance with constitutional standards, and included in this policy are guidelines for investigative detentions (*i.e.*, "*Terry*" stops) and a definition of "probable cause" for arrest.   [Doc. 61-11].   In addition, it is the policy of the City of Albuquerque Police Department that officers shall use only that force which is reasonably necessary to protect the sanctity of human life, preserve and protect individual liberties, and to effect lawful objectives, and it is the policy that all officers act in good faith in the exercise of force.   [Doc. 61-8].   Furthermore, it is the policy of the City of Albuquerque Police Department for its officers to investigate misdemeanor and felonious criminal activity in compliance with constitutional requirements.   [Doc. 61-10].   Moreover, the City of Albuquerque Police Department has a Personnel Code of Conduct wherein it requires that personnel shall obey all state and federal laws and obey and protect the rights of others provided in the United States Constitution to the best of their abilities.   [Doc. 61-14].

13

The City of Albuquerque Police Department also has a policy to allow bystanders to film or record officer-suspect contacts.  [Doc. 61-9].  The City of Albuquerque Police Department in addition has a policy which provides that officers shall furnish their name and employee number to any person requesting it except when withholding such information is necessary in the performance of their duties or otherwise authorized by proper authority.  [Doc. 61-13].  The City of Albuquerque Police Department has a policy which provides that personnel will use tape/digital recorders to document certain incidents and that all such recordings will be tagged into evidence. [Doc. 61-12].

The City of Albuquerque Police Department has a Personnel Code of Conduct wherein it requires that personnel will not act officiously or permit personal feelings, animosities, or friendship to influence their decisions.  [Doc. 61-14].  The City of Albuquerque Police Department has a Personnel Code of Conduct wherein it requires that personnel shall not directly or indirectly, by threat or bribe, attempt to secure the withdrawal or abandonment of a complaint or charges.  [Doc. 61-14].

## **STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).  Under Rule 56(c), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts

14

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted). The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).

The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). If the responding party fails to properly address the movant's assertion of fact as required by Rule 56(c), a district court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Although "[t]he provisions of Rule 56(c) for notice to the opposing party and an opportunity for him to serve opposing affidavits are mandatory," *Torres v. First State Bank of Sierra County*, 550 F.2d 1255, 1257 (10th Cir. 1977) (citation omitted); *accord Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991), "'[d]istrict courts must take care to insure that *pro*

15

*se* litigants are provided with proper notice regarding the complex procedural issues involved in summary judgment proceedings,'" *Jaxon v. Circle K. Corp.*, 773 F.2d 1138, 1140 (10th Cir. 1985) (quoting *Garaux v. Pulley*, 739 F.2d 437, 439 (9th Cir. 1984)); *see also Bellmon*, 935 F.2d at 1111.

Upon a motion for summary judgment, a district court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g*., *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

The standard for analyzing a motion for summary judgment shifts slightly if, as here, a defendant raises qualified immunity as a defense. The qualified immunity defense was created to shield public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). It provides immunity from suit and not merely from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It therefore spares defendants the burden of going forward with trial. *See Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995) (citation omitted).

Once a moving party raises the defense of qualified immunity, the nonmoving party must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v.*

*Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted); *see also, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).   If a nonmoving party fails to satisfy its two-part burden, a court must grant the moving party qualified immunity.   *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).   The Court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)).   If the nonmoving party successfully demonstrates the violation of a clearly established constitutional right, the moving party assumes the normal summary judgment burden of demonstrating that no genuine issue of material fact exists that would defeat its claim for qualified immunity.   *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992) (citations omitted), *cert. denied*, 509 U.S. 923 (1993).

## DISCUSSION

I.   <u>McRae and Richards' Motion for Summary Judgment.</u>

Plaintiff brings claims pursuant to 42 U.S.C. Section 1983 against Defendants McRae and Richards for unlawful detention and arrest in violation of the Fourth Amendment, for malicious prosecution in violation of the Fourth and Fourteenth Amendments, for retaliatory arrest in violation of the First Amendment, and for excessive force in violation of the Fourth Amendment. Section 1983 provides civil redress for deprivation of constitutional rights by persons acting under color of state law.   *See Wilson*, 52 F.3d at 1552; 42 U.S.C. § 1983.   "Section 1983 creates no substantive civil rights, but rather only a procedural mechanism for enforcing them."   *Wilson*, 52 F.3d at 1552 (citation omitted); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).   Plaintiff's Section 1983 claims, therefore, provide a procedural vehicle for enforcing his First, Fourth, and

Fourteenth Amendment rights under the Constitution.

Defendants McRae and Richards move for summary judgment on Plaintiff's Section 1983 claims the ground that they are shielded by qualified immunity. Qualified immunity is an affirmative defense against Section 1983 claims. *See Quezada v. County of Bernalillo*, 944 F.2d 710, 718 (10th Cir. 1991). Once a defendant raises the defense of qualified immunity in response to a summary judgment motion, a plaintiff must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone*, 94 F.3d at 1449 (citations omitted); *see, e.g.*, *Saucier*, 533 U.S. at 201-02. Defendants McRae and Richards contend that Plaintiff has failed to satisfy both of these burdens.

Specifically, with respect to the first prong, McRae and Richards maintain that they are entitled to qualified immunity on Plaintiff's Section 1983 claim for unlawful detention because, to the extent the encounter was not voluntary, Defendants had reasonable suspicion to investigate Plaintiff and probable cause to arrest him. McRae and Richards further argue that they are entitled to qualified immunity on Plaintiff's Section 1983 malicious prosecution claim because they had probable cause to support the arrest and the original action did not terminate in Plaintiff's favor. McRae and Richards also contend that they are shielded by qualified immunity against Plaintiff's Section 1983 claim for retaliatory arrest because First Amendment expression is subject to reasonable time, manner, and place restrictions. McRae and Richards last argue that they are entitled to qualified immunity against Plaintiff's Section 1983 claim for excessive force because Plaintiff's injuries were de minimis and the force they used was objectively reasonable under the

circumstances.

With respect to the second prong, Defendants McRae and Richards contend that the alleged violation of the right to be free from unlawful investigative detention was not clearly established because the Supreme Court and Tenth Circuit have held that reasonable suspicion can be predicated upon innocent activity.   [Doc. 60 at 24].   McRae and Richards next argue that the alleged violation to be free from unlawful arrest and malicious prosecution was not clearly established because a reasonable officer in the individual Defendants' position would not have been on notice that they were arresting Plaintiff without probable cause.   [*Id.*].   McRae and Richards also maintain that the alleged right to be free from retaliatory arrest was not clearly established because the Supreme Court specifically has held that there is no clearly established First Amendment right to be free from a retaliatory arrest that is supported by probable clause. [*Id.* at 25].   McRae and Richards last contend that the alleged right to be free from excessive force was not clearly established because a reasonable officer in Defendants' position would not have been on notice that displaying a firearm, handcuffing a suspect, or using approved police procedures and tactics such as the taser and face-down stabilization technique to subdue a suspect actively resisting arrest violates the Fourth Amendment or that an excessive force claim can proceed if the Plaintiff suffers only de minimis injuries as a result of the use of police force.   [*Id.*].

The Court examines whether Plaintiff has satisfied his burden of overcoming Defendants' assertion of qualified immunity for each of Plaintiff's Section 1983 claims in turn.   As a threshold matter, however, the Court first addresses Defendants' argument that the Court should deem Defendants' factual proffer admitted for purposes of deciding whether Plaintiff has satisfied the first part of his qualified immunity burden.

A.      The Court Denies Defendants' Request to Deem its Factual Proffer Admitted.

Defendants McRae and Richards ask the Court to deem its factual proffer admitted on the ground that Plaintiff has failed to comply with Federal Rule of Civil Procedure 56(C)(1)(a). That rule requires a party who is disputing facts to cite "to particular parts of the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(C)(1)(a); *see also* D.N.M. LR-Civ. 56.1 ("Each fact in dispute must be numbered, [and] must refer with particularity to those portions of the record upon which the non-movant relies[.]").[4] Defendants maintain that Plaintiff violates Rule 56(C)(1)(a) because he only "makes unsworn assertions, many of which are not in reference to specific exhibits, to support his contention that facts are in dispute." [Doc. 70 at 1-2].

Generally, if a party responding to a motion for summary judgment fails to properly address the movant's assertion of fact as required by Rule 56(c), a district court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). The Tenth Circuit has cautioned, however, that "'[d]istrict courts must take care to insure that *pro se* litigants are provided with proper notice regarding the complex procedural issues involved in summary judgment proceedings.'" *Jaxon v. Circle K. Corp.*, 773 F.2d 1138, 1140 (10th Cir. 1985) (quoting *Garaux v. Pulley*, 739 F.2d 437, 439 (9th Cir. 1984)); *accord Hall*, 935 F.2d at 1111; *Applied Capital, Inc. v. Gibson*, 05-CV-0098 JB/ACT, 2007 WL 5685131, *11 (D.N.M. Sept. 27,

---

[4]   Defendants also argue that the Court should deem their factual proffer admitted on the ground that Plaintiff's response brief exceeds the 24-page limit set forth in Local Rule 7.5. *See* D.N.M. LR-Civ. 7.5. Because Plaintiff's failure to comply with the page limit is not related to the factual proffer made by Defendants, the Court does not find Defendants' argument persuasive.

2007).

In *Jaxon v. Circle K Corp.*, for example, the Tenth Circuit reversed a grant of summary judgment in favor of the defendant. *See* 773 F.2d at 1140. The district court had held that the plaintiff's unsworn evidence—which would have precluded a grant of summary judgment if submitted in proper form—was insufficient to oppose summary judgment. *See id.* at 1139, 1140. The Tenth Circuit held, however, that "the district court's failure to grant [the plaintiff] additional time to obtain affidavits or to verify his complaint require[d] reversal of the summary judgment against him," because "'[t]he rights of *pro se* litigants require careful protection where highly technical requirements are involved, especially when enforcing those requirements might result in a loss of the opportunity to prosecute or defend a lawsuit on the merits.'" *Id.* (quoting *Garaux*, 739 F.2d at 439).

Thus, although the Tenth Circuit has repeatedly held that *pro se* litigants must follow the same rules of procedure that govern other litigants, *see Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005), the *Jaxon* decision requires that a court exercise care to protect the litigant's rights when a *pro se* litigant fails to properly dispute facts before a court on summary judgment. *See Jaxon*, 773 F.3d at 1139-40. While Plaintiff did not specifically refute Defendants' facts in the manner contemplated by the Federal and Local Rules, and the Court could deem the facts admitted pursuant to Rule 56(c), consistent with *Jaxon*, the Court declines to so hold because Plaintiff is *pro se*.

Rather, to the extent Plaintiff attempts to controvert Defendants' facts in the body of his opposition to the motion for summary judgment, the Court will consider those facts in dispute to the facts presented by Defendants. *Cf. Pinson v. Equifax Credit Information Servs., Inc.*, No.

06-CV-162-GKF-SAJ, 2008 WL 2329137 (N.D. Okla. Jun 2, 2008) (holding that, although the pro

se plaintiffs "did not specifically respond to or address the undisputed facts in the manner

contemplated by the Local Civil Rules," and the court "could deem [the defendant's] material facts

confessed," the court would consider "the facts the [plaintiffs] attempt to controvert in the body of

their response brief" because the plaintiffs are pro se); *Peru v. T-Mobile USA, Inc.*, 897 F. Supp. 2d

1078, 1084-85 (D. Colo. 2012) (treating facts not verified under penalty of perjury recited in a pro

se party's opposition to a motion for summary judgment as an affidavit attested to pursuant to 28

U.S.C. Section 1746 because the court was "satisfied that were [the pro se plaintiff] to be permitted

to remedy such defect, she would do so").[5]   The Court is confident that Plaintiff could remedy the

defect of presenting unverified facts in short order if permitted to do so, and therefore concludes

that considering the facts protects Plaintiff's rights and is not prejudicial to Defendants.

Accordingly, the Court denies McRae and Richards' request to deem their factual proffer

undisputed.[6]

---

[5]   *See also Barnes v. U.S.*, No. 04-3445, 2005 WL 1525268, at *4 (10th Cir. June 29, 2005) (finding no abuse of discretion where district court considered pro se litigant's documents that were not, but could likely be, properly authenticated prior to trial, and explaining that district court's "forbearance" was appropriate in light of the court's obligation to "insure that pro se litigants are provided with proper notice regarding the complex procedural issues involved in summary judgment proceedings"); *Weinbaum v. Las Cruces Pub. Schs.*, 465 F. Supp. 2d 1116, 1130 n.16 (D.N.M. 2006) (district court can consider an unauthenticated plaintiff's exhibit for summary judgment purposes if the plaintiff "could likely authenticate the letter in short order" at trial) (citation omitted); *Hall*, 935 F.2d at 1111 (cautioning that "district courts must take care to insure that pro se litigants are provided with proper notice regarding the complex procedural issues involved in summary judgment proceedings").

[6]   The Court notes that, even if it were to deem Defendants' proffer of facts admitted, the Court nonetheless would conclude that, on Defendants' facts alone, Plaintiff has satisfied his burden of pointing to facts which, if true, constitute a violation of his constitutional right to be free from unlawful detention.   It is only with respect to Plaintiff's excessive force claim that Plaintiff's unsworn assertions of fact have dispositive import.

B.     Defendants are Not Entitled to Qualified Immunity from Plaintiff's Section 1983 Claims for Unlawful Detention but are Entitled to Qualified Immunity from Plaintiff's Claim for Unlawful Arrest.

To withstand summary judgment on the ground of qualified immunity, Plaintiff must (1) assert facts which, if true, would constitute a violation of a constitutional right, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted).   With respect to Plaintiff's Section 1983 claim for unlawful detention, the Court concludes that Plaintiff has satisfied both parts of his burden and therefore denies McRae and Richards' Motion for Summary Judgment to the extent it seeks dismissal of this claim.   With respect to Plaintiff's Section 1983 claim for unlawful arrest, however, the Court concludes that Plaintiff has failed to assert facts which, if true, constitute a violation of his constitutional rights.   Thus, the Court grants Defendants McRae and Richards' motion to the extent it seeks summary dismissal of the unlawful arrest claim.

1.     Constitutional Violation.

In determining whether Plaintiff has satisfied the first part of his qualified immunity burden, the Court's analysis focuses on whether Plaintiff has asserted facts which, if true, constitute a substantive violation of the Fourth Amendment.   For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories:   (1) consensual encounters; (2) investigative stops; and (3) arrests.   *See Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000).

A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the

encounter.  *See id.*   Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  *Id*.   An encounter that is not consensual may nevertheless be justified as an investigative detention.   An investigative detention occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'"  *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)).   An arrest, in contrast, is a "'highly intrusive or lengthy search or detention.'"   *Id.* (quoting *U.S. v. Cooper*, 733 F.2d 1360, 1363 (10th Cir. 1984)).   An officer may make an arrest without a warrant if the officer has probable cause to believe a crime has been committed by the arrestee.  *See id.* (citation omitted).

Defendants McRae and Richards contend that Plaintiff has not satisfied his qualified immunity burden of pointing to facts that constitute an unlawful seizure in violation of the Fourth Amendment.   Specifically, Defendants contend that their initial questioning of Plaintiff, up until Plaintiff complied with McRae's order to exit the vehicle, was consensual, that their subsequent detention of Plaintiff and accompanying search was supported by reasonable suspicion, and that their arrest of Plaintiff was conducted with probable cause.   The Court rejects Defendants' arguments that their initial encounter with Plaintiff was voluntary or that the initial detention was supported by reasonable suspicion but agrees with their contention that they arrested Plaintiff with probable cause.

a.   <u>The Initial Encounter was not Voluntary</u>.

Defendants argue that their initial questioning of Plaintiff, up through the time that Plaintiff complied with McRae's order to exit the vehicle, constituted a voluntary encounter not subject to

Fourth Amendment protection.[7]   In support of this contention, Defendants argue that Plaintiff's refusal to comply with McRae's orders to roll down the window and exit the vehicle is fatal to his claim because the Fourth Amendment does not apply to non-compliant suspects.   [Doc. 60 at 13].   Defendants cite case law applicable to fleeing felons to buttress their position.   [*Id.*].

The cases cited by Defendants hold that until the fleeing suspect "submits" to police authority or until the police succeed in stopping the suspect, no seizure has occurred and the Fourth Amendment is not implicated.   *See, e.g.*, *Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994) ("[W]hen law enforcement officers shoot at a fleeing suspect, a 'seizure' occurs only if the shot strikes the fleeing person or if the shot causes the fleeing person to submit to this show of authority."), *cert. denied*, 513 U.S. 1109 (1995); *Latta v. Keryte*, 118 F.3d 693, 700 (10th Cir. 1997) (holding that no seizure occurred because, "while the pursuit constituted an assertion of authority, the pursuit did not cause [the suspect] to submit to the authority or succeed in stopping him").   Defendants reason that, because Plaintiff refused to comply with McRae's orders, Plaintiff did not submit to police authority and that the cases they cite compel the Court to hold that Plaintiff was not seized.

The Court is not persuaded.   The cases identified by Defendants do not stand for the broad proposition that police are immunized from Fourth Amendment scrutiny whenever a suspect fails to comply with police orders.   Rather, the cases stand for the narrow proposition that, when a

---

[7]   It is unclear precisely what practical import a ruling from this Court that Defendants' initial interaction with Plaintiff was voluntary might have on Plaintiff's claims.   Defendants concede that once Plaintiff exited his vehicle, the encounter became an investigative detention, and that, at this point, they were required to have reasonable suspicion to support the seizure.   Defendants do not explain why they benefit from characterizing the initial encounter, prior to Plaintiff's exit from the vehicle, as voluntary.   Regardless of their reasoning, however, the Court rejects the argument that the initial encounter was voluntary.

25

suspect is in flight, the Fourth Amendment is not implicated until the suspect submits to the police or the police succeed in stopping the suspect.   Here, Plaintiff was not in flight.   To the contrary, he was stopped in his vehicle, sitting in the driver's seat, with his exit impeded because Defendant McRae was standing in front of the car door.   Because the cases McRae and Richards cite apply only to a suspect who is in flight and Defendants have not pointed to any other authority holding that a suspect's failure to comply with police orders immunizes the police from Fourth Amendment scrutiny, the Court rejects Defendants' argument.

Having decided that Plaintiff's failure to follow Defendant McRae's request to roll his window down more than a few inches or to exit the vehicle when initially ordered to do so is not fatal to his claim that McRae's initial encounter with Plaintiff constituted an unlawful seizure, the Court next examines whether the encounter was consensual and therefore voluntary or whether it constituted an investigative detention that implicates the Fourth Amendment.   The Tenth Circuit has explained that, "'[w]ithout any basis for suspecting the criminal involvement of a particular individual, police may communicate and ask questions of that individual.'"   *Id.* at 699 (quoting *U.S. v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996)).   A consensual encounter, however, that rises to the level of a seizure, must be supported by reasonable suspicion or probable cause.   *See id.* "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."   *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980); *accord Latta*, 118 F.3d at 698 (citation omitted).

> "Courts have identified several factors that could lead a reasonable innocent person to believe that he is not free to disregard the police officer, including[] the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by

26

> an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed space; and absence of other members of the public."

*Id.* at 699 (quoting *Sanchez*, 89 F.3d at 718).

The Court concludes that, construing the facts in Plaintiff's favor, the initial encounter between Plaintiff and McRae was not consensual. McRae attests in his affidavit that he approached Plaintiff's vehicle, stood in front of the driver's side door where he could not see Plaintiff fully through the window, and initially "asked" Plaintiff to roll down his window. [Doc. 60-1 at 2]. McRae concedes, however, that when Plaintiff "did not roll down the window," McRae then "ordered" Plaintiff to roll down his window. [*Id.*]. When Plaintiff failed to comply with this order, McRae then drew his firearm, aiming it—according to McRae[8]—in the low-ready position, and again "ordered" Plaintiff to exit the vehicle. [*Id.* at 2-3].

For an encounter to be consensual and voluntary, a reasonable person must feel free either to comply with or disregard an officer's request. *See Mendenhall*, 446 U.S. at 554; *Latta*, 118 F.3d at 698. The Court concludes that, under these circumstances, a reasonable person would have believed that McRae's initial order, issued while he was standing in front of the door of the driver's-side seat Plaintiff was occupying, and his subsequent order, accompanied by the drawing and aiming of his gun (even if it were aimed in the low-ready position instead of at Plaintiff's head), was compulsory. Indeed, even one order alone from a police officer could be sufficient,

---

[8]   Plaintiff maintains that McRae aimed his weapon at Plaintiff's head. For purposes of determining whether Plaintiff has satisfied his qualified immunity burden, the Court accepts as true this fact asserted by Plaintiff. For purposes of determining whether the initial encounter was voluntary, however, the Court notes that, even on McRae's version of the facts, it nonetheless would find in Plaintiff's favor.

under some circumstances, to lead a reasonable person to believe that compliance is mandatory. Certainly, however, two orders from a police officer, accompanied by the brandishing of a weapon, aimed in a low-ready position or otherwise, to a person sitting in the small and confined space of an automobile, with the officer standing in front of the door impeding exit from the vehicle, is sufficient to lead a reasonable person to believe that compliance is mandatory. *Cf. id.* Thus, the Court concludes that the initial encounter between Plaintiff and McRae—up through the time that officers removed Plaintiff's handcuffs and informed Plaintiff that he was free to leave the scene—was not voluntary and that Plaintiff was "seized" for Fourth Amendment purposes.

To the extent Defendants argue that Plaintiff was not "seized" because he did not initially comply with Defendant McRae's requests, the Court is not persuaded. First, the Court has no doubt that detained suspects regularly are both non-compliant and "seized" for Fourth Amendment purposes. This is true regardless of whether the suspect subjectively believed his compliance was compulsory. *Cf. U.S. v. Villegas*, 554 F.3d 894, 899 (10th Cir.) (explaining that a suspect's "subjective understanding of the encounter is not relevant because '[a] person is seized only when that person has an *objective* reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way'") (quoting *U.S. v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996)), *cert. denied*, 557 U.S. 944 (2009). Second, the Court already has rejected Defendants' argument that case law concerning fleeing suspects is applicable to Plaintiff because Plaintiff was not in flight.

        b.     <u>The Investigative Detention was not Supported by Reasonable Suspicion</u>.

When an encounter "rises to the level of a seizure, the seizure must be supported by the requisite level of suspicion or probable cause. For example, a police officer who observes

28

suspicious circumstances may stop an individual briefly to investigate the circumstances provoking suspicion." *Latta*, 118 F.3d at 698 (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "In analyzing whether such an investigative detention complies with the Fourth Amendment, [a court] must determine whether the officer has reasonable suspicion to detain the individual." *Id.* at 699 (citing *Terry*, 392 U.S. at 21). Reasonable suspicion "requires considerably less than proof of wrongdoing by a preponderance of the evidence, but something more than an inchoate and unparticularized suspicion or hunch." *U.S. v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (internal quotations omitted). The officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *accord Latta*, 118 F.3d at 699. "Those facts must tend to show that the detainee has committed or is about to commit a crime." *U.S. v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004) (citations omitted). The inquiry requires the Court to consider the facts against the objective standard whether the facts available to the officer "at the moment of seizure . . . warrant an [officer] of reasonable caution in the belief that the action taken was appropriate." *See Terry*, 392 U.S. at 21-22 (internal quotation marks and citation omitted). Once police officers make a stop based on reasonable suspicion, the scope of that stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 20 (explaining that the inquiry is a "dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place"); *see also U.S. v. King*, 990 F.2d 1552, 1562 (10th Cir. 1993).

  In support of their contention that they had reasonable suspicion to detain Plaintiff, Defendants point to the following facts. First, Defendants argue that Plaintiff's behavior of

sitting outside of the Lotus nightclub for 45 minutes in a parked car staring at women was suspicious and that it would have led a reasonable officer to investigate Plaintiff to determine if he was committing the crimes of stalking, kidnapping, or false imprisonment.   [Doc. 60 at 14-15]. Next, Defendants contend that it was suspicious that Plaintiff's vehicle had a temporary tag with an expiration date more than 30 days past the date of purchase and that a "reasonable officer would [have] investigate[d] . . . to ensure that th[e] vehicle was not stolen.   [*Id.* at 15].   McRae explains in his affidavit that, "based upon [his] experience, it is uncommon for a temporary tag to display an expiration date past 30 days of purchase."   [Doc. 60-1 at 2].

The Court must consider whether the foregoing facts, "taken together," along with "rational inferences from those facts, reasonably warrant[ed] the intrusion," *Terry*, 392 U.S. at 21, and whether the facts tended to show that Plaintiff had committed or was about to commit a crime, *see Johnson*, 364 F.3d at 1194 (10th Cir. 2004).   The Court concludes that the facts before the Court, taken together, do not tend to show that Plaintiff had committed or was about to commit the criminal activities of stalking, kidnapping, or false imprisonment.   Indeed, those facts alone do not tend to show that Plaintiff had committed or was about to commit any crime.   Thus, the Court cannot conclude that Defendants had reasonable suspicion to detain and investigate Plaintiff.

Defendants assert in their opening brief that Lotus management was "concerned about Plaintiff . . . because the Lotus nightclub was hosting an underage event which included young female patrons," [Doc. 60 at 2], that Plaintiff was suspicious because he "may have been waiting to pick up an unsuspecting underage female," [Doc. 60-1 at 2], that "Plaintiff was in his vehicle for approximately 45 minutes staring at underage female patrons who were attending an underage event at the club," [*id.* at 13], and that "[t]he report of Plaintiff sitting in his vehicle for

approximately 45 minutes staring at young underage girls certainly warranted investigation as Plaintiff could have been possibly stalking one or more of these females to possibly attack, kidnap, falsely imprison or take advantage of them in some manner," [*id.* at 14-15].

At the outset, the Court notes that Defendants repeatedly emphasize in their opening brief and supporting materials that Plaintiff's behavior was suspicious because he was staring at "young underage girls" attending an "underage event," [Doc. 60 at 2, 13, 14, 15; Doc. 60-1 at 2], and that he may have been attempting to "pick up" these "unsuspecting" females, [*id.*].   These assertions are problematic for two reasons.   First, to use the descriptor "young underage girls" to characterize the females at whom Plaintiff reportedly was staring is misleading because the charge suggests that these females were under eighteen years of age while Plaintiff—then in his 40s—was well over the age of majority.   The witness statements, however, make clear that the word "underage" refers to the legal drinking age of 21, and not to the legal age of majority of 18.   [Doc. 60-1 at 9].   Defendants' references throughout their opening brief and affidavits seem intentionally to blur this distinction.   Second, to premise a finding of reasonable suspicion on the assumption that Plaintiff was parked for the purpose of trying to "pick up" an "unsuspecting" female is problematic because the attempt to date or otherwise solicit the attentions of another person, even if the object of one's attention is "unsuspecting," is not a criminal act at all.

The unembellished facts, as supported by the evidence presented by Defendants, are (1) that Plaintiff was sitting in the driver's seat of his car and parked on a public street for 45 minutes in front of a nightclub; and (2) that Plaintiff was staring at women over the age of eighteen attending an eighteen-and-over party at the nightclub.   Plaintiff contests the fact that he was "staring" at any females and instead asserts that he was paying "little to no attention" to the club's

patrons.   For purposes of determining whether Plaintiff has satisfied his qualified immunity burden, the Court assumes the Plaintiff's assertion that he was not staring at any of the club's patrons is true.   The Court concludes that these facts, even under the totality of the circumstances, would not have led a reasonable officer in Defendants' position to conclude that Plaintiff had committed or was committing the crimes of stalking, kidnapping, or false imprisonment. Moreover, even if Plaintiff had not disputed Defendants' assertion that he was "staring" at female patrons, the Court nonetheless would conclude that Defendants lacked reasonable suspicion to believe that Plaintiff had committed or was committing a crime.

The crime of stalking "consists of knowingly pursuing a pattern of conduct, without lawful authority, directed at a specific individual when the person intends that the pattern of conduct would place the individual in reasonable apprehension of death, bodily harm, sexual assault, confinement or restraint of the individual or another individual."   N.M. Stat. Ann. § 30-3A-3(A). The crime of kidnapping consists of "the unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent:   (1) that the victim be held for ransom; (2) that the victim be held as a hostage or shield and confined against his will; (3) that the victim be held to service against the victim's will; or (4) to inflict death, physical injury or a sexual offense on the victim."   *Id*. § 30-4-1(A).   The crime of false imprisonment consists of "intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so."   *Id.* § 30-4-3.   The crime of attempt to commit a felony consists of "an overt act in furtherance of and with intent to commit a felony and tending but failing to effect its commission."   *Id.* § 30-28-1.

Although reasonable suspicion "requires considerably less than proof of wrongdoing by a

preponderance of the evidence," it requires "something more than an inchoate and unparticularized suspicion or hunch."  *U.S. v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (internal quotations omitted).   Even if Defendant McRae sincerely and subjectively believed that Plaintiff had committed or was about to commit the crimes of stalking, kidnapping, or false imprisonment, the Court concludes that McRae did not have articulable facts or rational inferences to support this conclusion, but rather was operating solely upon an inchoate and unparticularized suspicion or hunch.

The language Defendants' use in their opening brief and affidavits confirms the purely speculative nature of their hunch.   Defendants argue, for example, that Plaintiff "may have been" or "could have been possibly" waiting to solicit females for the purpose of stalking, kidnapping, attacking, or falsely imprisoning them.   [Doc. 60 at 2, 14-15; Doc. 60-1 at 2].   Defendants' word choice is not surprising.   Indeed, to suppose solely from the acts of sitting in a parked vehicle outside of a nightclub hosting a party—even if the person is staring at female patrons—that a person is sitting in wait to commit the crimes of stalking, false imprisonment, or kidnapping requires a sizeable inferential leap.   The language Defendants choose to connect the two seemingly-unrelated activities of sitting in a car and committing the aforementioned crimes is itself indicative of this leap.

Defendants concede that the behavior of sitting in one's car on a public street is not criminal in and of itself but argue that innocent behavior does not negate a finding of reasonable suspicion.   [Doc. 60 at 14].   Defendants cite the Supreme Court's decisions in *Terry v. Ohio*, 392 U.S. 1 (1968), and *United States v. Sokolow*, 490 U.S. 1 (1989), and the Tenth Circuit's decision in *Oliver v. Woods*, 209 F.3d 1179 (10th Cir. 2000), in support of their contention that innocent acts

33

considered together may give rise to reasonable suspicion that criminal activity is afoot.

The Court has no quibble with this proposition.   It is well established that acts which alone are innocent may, when considered together as a series, give rise to the requisite level of suspicion that criminal activity is afoot.   The innocent acts in the cases Defendants identify, however, are distinguishable from the acts at issue here and therefore those cases do not support the conclusion Defendants advance.

In *Terry v. Ohio*, the Supreme Court held that an officer had reasonable suspicion to detain suspects who were engaging in "a series of acts, each of them perhaps innocent in itself," because the acts "taken together warranted further investigation."   392 U.S. at 22.   The Supreme Court explained, "There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone.   Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs.   Store windows, moreover, are made to be looked in."   *Id.* at 22-23.   The Court reasoned, however, that

> the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away.

*Id.* at 23.   The Supreme Court concluded, "It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further."   *Id.*

That the innocent discrete acts the Supreme Court considered in *Terry* together gave rise to

reasonable suspicion is not surprising.   Unlike the circumstances at issue here, the suspects in *Terry* were not simply sitting in their car on a public street people-watching in front of an open business that was hosting a party and had an influx of patrons entering and exiting the establishment.   Rather, the *Terry* suspects were engaged in conduct that under the totality of the circumstances was suspicious and not consistent with ordinary behavior.   Moreover, the behavior of the suspects in *Terry* had probative significance to the crime of thievery and could have suggested to a reasonable officer that the suspects were about to commit the crime.   In contrast, as discussed, the behaviors of sitting in a parked car for 45 minutes, even if one was also staring at patrons entering and exiting a nightclub, has little probative significance to the criminal activities of stalking, kidnapping, false imprisonment, or any other crime.   Finally, the *Terry* Court relied upon numerous related facts to support reasonable suspicion, whereas here Defendants rely upon only a few facts, in conjunction with one seemingly unrelated fact (*i.e.*, the license plate), that, even if considered together, are not indicative of criminal activity.   Thus, unlike the acts in *Terry*, the acts here, even when considered together, are entirely consistent with benign conduct and not probative of criminal activity.   If the otherwise innocent conduct identified by Defendants is sufficient when considered together to give rise to reasonable suspicion of criminal activity, then the police may detain, draw their weapons, handcuff, and search anyone waiting in a vehicle on a public street while people-watching.   The Court does not so hold.

The facts in *United States v. Sokolow*, likewise, are distinguishable and do not support a finding of reasonable suspicion here.   In *Sokolow*, the Supreme Court held that any individual factor the officers considered was "not by itself proof of any illegal [drug smuggling] conduct and [wa]s quite consistent with innocent travel," but that "taken together the[ facts] amount[ed] to

35

reasonable suspicion."   490 U.S. at 9, 10 (citation omitted).   The Court explained that "[p]aying $2,100 in cash for two airplane tickets is out of the ordinary, and it is even more out of the ordinary to pay that sum from a roll of $20 bills containing nearly twice that amount of cash," because "[m]ost business travelers . . . purchase airline tickets by credit card or check so as to have a record for tax or business purposes, and few vacationers carry with them thousands of dollars in $20 bills."   *Id.* at 8-9.   The Court further explained that "the agents had a reasonable ground to believe that respondent was traveling under an alias," and that "few residents of Honolulu travel from that city for 20 hours to spend 48 hours in Miami during the month of July."   *Id.* at 9.

As in *Terry*, the acts before the *Sokolow* Court had probative significance, whereas the acts here are not indicative of criminal activity.   In both cases, the acts were suspicious when considered together, they were out of the ordinary, they were probative of criminal activity, and they were manifold.   Here, a man sitting in a parked car on a public street for 45 minutes, even if he is attempting to "pick up" or otherwise solicit the attention of a woman, is not suspicious, extraordinary, or probative of criminal activity.   Because the facts here are distinguishable, the Court concludes that *Sokolow* does not support a decision in Defendants' favor.

The Court likewise concludes that the Tenth Circuit's decision in *Oliver v. Woods* is not determinative.   In *Oliver*, the plaintiff claimed that a police officer unlawfully seized him when he approached the plaintiff in a parking lot and detained the plaintiff for questioning.   *See* 29 F.3d 1179, 1187 (10th Cir. 2000).   The officer maintained that he had reasonable suspicion that the plaintiff was engaged in the crime of oil dumping.   *See id.*   The *Oliver* court agreed and held that the officer had reasonable suspicion to detain the plaintiff even though the officer admitted that he saw nothing in particular to indicate that the plaintiff was engaged in illegal oil dumping or any

other crime.  *See id.*   As in *Terry* and *Sokolow*, the *Oliver* court relied upon the proposition that even innocent behavior can form the basis for reasonable suspicion when considered under the totality of the circumstances.   *See id.* (citing *Terry*, 392 U.S. at 22-23).

Although the officer in *Oliver* did not observe any specific facts suggesting that the plaintiff was engaged in any crime, *Oliver* is distinguishable because the totality of the circumstances gave rise to reasonable suspicion.   The Tenth Circuit explained,

> Officer Woods knew the "varda" alarm had been set at the request of the owner of [the business] due to illegal oil dumping in the parking lot.  The business was closed and it was near dawn when Officer Woods observed [the plaintiff] in the parking lot after the alarm was triggered.  Even though Officer Woods testified at his deposition that, as he approached [the plaintiff], he saw nothing in particular to indicate Mr. Oliver was engaged in illegal oil dumping or any other crime, and that he knew "varda" alarms were tripped by innocent people "all the time," based on the totality of the circumstances known to him, Officer Woods could have reasonably suspected Mr. Oliver was engaged in illegal activity such as trespass or oil dumping.

*Id.*  Thus, in *Oliver*, the circumstances—namely the triggered alarm that had been set to prevent and apprehend individuals engaged in illegal oil dumping—suggested that a crime had been and/or was about to be committed, and the plaintiff's physical presence in the parking lot for no explained reason after the alarm was triggered was sufficient to implicate the plaintiff in this crime.

Here, Plaintiff's presence on the public street was not accompanied by any other circumstances suggesting that the crime of stalking, kidnapping, false imprisonment, or any other crime, had or was about to occur.   For example, the officers did not have any cause to suspect that a particular woman attending the party was being stalked or was a potential victim of an intended abduction.  Likewise, the officers had no notice that a predator was stalking women or had abducted women in the area surrounding the nightclub.  Thus, because the facts in this case are

not akin to the facts in *Oliver*, the mere presence of Plaintiff in front of the nightclub is not sufficient to satisfy the reasonable suspicion standard.

For the foregoing reasons, the Court holds that Plaintiff's behavior of sitting for 45 minutes in a parked car on a public street in front of a nightclub—even if staring at women—does not give rise to reasonable suspicion under the holdings of *Terry*, *Sokolow*, *Oliver*, or otherwise.   Having so held, the reasonable suspicion inquiry next requires the Court to consider whether the fact that Plaintiff's car had a temporary license plate with an expiration date of more than thirty days past the date of purchase, in conjunction with Plaintiff's behavior, alters the Court's conclusion.   *Cf. Terry*, 392 U.S. at 21 (a court must consider whether all of the facts "taken together" give rise to reasonable suspicion).

Defendant McRae attests that it is "uncommon" for a temporary tag to have an expiration date greater than 30 days from the date of purchase and Defendants argue that the temporary tag is indicative of the crime of automobile theft.   [Doc. 60 at 14-15].   An officer's experience and training may play a role in allowing the officer to make inferences, based on a combination of the surrounding circumstances, that criminal activity is afoot.   *See U.S. v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004) (holding that the officer was reasonable to suspect criminal activity was afoot where the officer's "suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details"). The touchstone of the inquiry, however, is whether the facts and inferences therefrom give rise to reasonable suspicion that an activity which is *criminal* is taking place.   *See id.* ("[the] facts must tend to show that the detainee has committed or is about to commit a *crime*") (emphasis added). McRae's affidavit testimony does not suggest that his experience led him to infer, from the

38

expiration date on the license plate, that the criminal activity of automobile theft was afoot but rather indicates only that in McRae's experience it is "uncommon" for a temporary tag to display an expiration date past 30 days of purchase.   [Doc. 60 at 2].   This fact alone, without any other evidence to suggest that the temporary tag was fraudulent, or that an expiration date past 30 days of purchase is in McRae's experience linked to theft, is not probative of criminal activity. Moreover, Defendants cite to no authority—and this Court finds none—holding that a temporary tag with an expiration date that has not yet expired but which exceeds 30 days from the date of purchase constitutes an articulable fact that gives rise to reasonable suspicion that criminal activity is afoot.[9]   As such, the Court is not persuaded that the fact tips the scale towards a finding of reasonable suspicion.

Furthermore, even if the Court were to conclude that the temporary tag was probative of the criminal activity of automobile theft, the Court nonetheless would hold that an investigative detention premised on the license plate creating reasonable suspicion that theft had or was about to occur violated Plaintiff's Fourth Amendment rights.   To comply with the Fourth Amendment, an investigative detention must not only be supported by reasonable suspicion, but the stop also must be "reasonably related in scope to the circumstances which justified the interference in the first place."   *Terry*, 392 U.S. at 20 (explaining that the inquiry is a "dual one—whether the officer's

---

[9]   The Tenth Circuit has recognized that a vehicle's failure to display some visible form of license plate or registration tag, whether temporary or permanent, gives rise to reasonable suspicion that "its driver might be violating any of the multitude of applicable traffic and equipment regulations of the jurisdiction."   *U.S. v Montes-Ramos*, No. 07-2027, 2009 WL 3138866, at *3 (10th Cir. Oct. 1, 2009) (citing *U.S. v. Edgerton*, 438 F.3d 1043, 1048 (10th Cir. 2006)).   Likewise, the Tenth Circuit has held that a temporary license plate, when combined with other facts, may give rise to reasonable suspicion of criminal drug activity.   *See, e.g.*, *U.S. v. Espinosa*, 782 F.2d 888, 891 (10th Cir. 1986) (reasonable suspicion based on hesitation prior to answering questions, temporary license plate, travel from drug source area, and relative lack of luggage for vacation).

action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place"); *see also U.S. v. King*, 990 F.2d 1552, 1562 (10th Cir. 1993).

Here, even the facts advanced by Defendants do not demonstrate that the scope of the stop was related to an investigation whether Plaintiff had stolen a car.   The facts do not establish that Defendants asked Plaintiff any questions about his temporary tag, that Defendants investigated whether the license plate was fraudulent, or that Defendants conducted any other investigation of the crime of car theft.   Rather, the facts indicate only that Defendants ran Plaintiff's identification through NCIC to determine whether he had any outstanding arrest warrants and that Defendants conducted an investigation to determine why Plaintiff was parked in front of the Lotus nightclub. [Doc. 60-1 at 11].   This latter investigation was related to Plaintiff's behavior of sitting in a parked car in front of the night club for 45 minutes and not related to his temporary license plate. Thus, the Court concludes that any detention justified at its inception by a concern about a license plate with a protracted expiration period and potential automobile theft could not support Defendants' investigation of Plaintiff because the investigation was not reasonably related in scope to the circumstances which justified the interference in the first place.   Thus, to the extent Defendants rely upon the license plate to support a finding of reasonable suspicion, the Court concludes that the facts asserted by Plaintiff constitute a violation of Plaintiff's Fourth Amendment right to be free from unlawful detention for this reason as well.

The Court's conclusion that the license plate does not support a finding of reasonable suspicion is true even if the Court considers the license plate in conjunction with Plaintiff's behavior of sitting in a car parked in front of a nightclub for 45 minutes and—on Defendants'

facts—staring at women.   Defendants do not explain, nor can this Court discern, how the fact of a temporary tag with an expiration date more than 30 days from the date of purchase is related to the crimes of stalking, kidnapping, and false imprisonment that Defendants contend Plaintiff's behavior of sitting in a parked car for 45 minutes and staring at women implicated.   Defendants likewise do not indicate how Plaintiff's behavior of sitting in a parked car for 45 minutes staring at women implicates the crime of automobile theft.   Defendants' opening brief highlights that these two sets of facts—*i.e.*, the license plate and Plaintiff's behavior—are unrelated.   Defendants argue that the temporary tag is indicative of the crime of automobile theft while Plaintiff's behavior is indicative of the crimes of stalking, kidnapping, and false imprisonment.   [Doc. 60 at 14-15].   Because these two sets of facts are unrelated, the Court concludes that considering the temporary license plate and Plaintiff's behavior together is not more compelling than considering these two sets of acts apart.   Thus, the Court holds that the facts of Plaintiff's behavior and the license plate, even if taken together, are insufficient to lead a reasonable officer in Defendants' position to believe that Plaintiff had committed or was about to commit a crime.

For the reasons stated herein, the Court concludes that, on the facts asserted by Plaintiff (and even on the facts identified by Defendants), McRae and Richards did not have reasonable suspicion to detain Plaintiff for investigation.   Accordingly, the Court holds that Plaintiff has satisfied the first prong of his qualified immunity burden by asserting facts which, if true, constitute a violation of Plaintiff's Fourth Amendment right to free from an investigative detention without reasonable suspicion.

c. <u>Defendants Had Probable Cause to Arrest Plaintiff</u>.

The Court next determines whether Plaintiff has satisfied the first part of his qualified

immunity burden by asserting facts which, if true, constitute a constitutional violation of his right to be free from arrest without probable cause.   An officer may make an arrest without a warrant only if the officer has probable cause to believe a crime has been committed by the arrestee.   *See Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) (citation omitted).

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"   *U.S. v. Valenzuela*, 365 F.3d 892, 896-97 (10th Cir. 2004) (quoting *U.S. v. Edwards*, 242 F.3d 928, 934 (10th Cir. 2001)).   Probable cause is measured against an objective standard.   *See Beck v. Ohio*, 379 U.S. 89, 96 (1964).   Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer."   *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (alterations omitted) (internal quotation marks omitted).   If Defendants had probable cause to arrest Plaintiff for any one of the crimes charged, Plaintiff may not prevail on his Section 1983 unlawful arrest claim.   *See Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012) (a "claim for unlawful arrest cannot stand if there was probable cause for any offense that could be charged").

The Court first considers whether Plaintiff has pointed to facts which, if true, establish that Defendants had probable cause to arrest Plaintiff for assault on a peace officer.   The crime of assault on a peace officer consists of "any unlawful act, threat or menacing conduct which causes a peace officer while he is in the lawful discharge of his duties to reasonably believe that he is in danger of receiving an immediate battery."   N.M. Stat. Ann. § 30-22-21(A)(2).

Defendant McRae attests that Plaintiff walked up to McRae with a large cell phone, and pointed the phone, only inches away, at McRae's face in an aggressive manner, and Defendant Metzgar reports that Plaintiff "walk[ed] towards Lt. McRae in a fast and determined manner and put his camera phone approximately 1½ feet away from his face in a violent manner as if to possibility strike [McRae]."   McRae attests that he was "fearful that [Plaintiff] was going to batter [him] so [he] told [Plaintiff] that he was under arrest since he had just assaulted [him]." Moreover, Defendants McRae and Richards had run an NCIC search, which revealed a hazard warning for law enforcement personnel because Plaintiff had a record of battering police officers. Plaintiff admits that he retrieved his cell phone from his vehicle and that he began to take pictures of the police officers.   The Court concludes that these facts are sufficient to lead a reasonable officer in Defendants' position to believe that Plaintiff had committed the offense of assault on a peace officer.

The Court is not persuaded to hold otherwise by Plaintiff's conclusory assertion that he did not assault McRae.   [Doc. 67 at 10].   Plaintiff does not present any facts—not even inadmissible or unverified facts—specifically to refute Defendants' assertions that he walked towards McRae in an aggressive manner or that he put his cell phone in McRae's face in a violent manner as if to strike McRae.   Although the Court must construe pro se filings liberally, it nonetheless must hold pro se parties to uniform rules of evidence and procedure.   Thus, the Court declines to consider Plaintiff's conclusory allegation that he did not commit assault as sufficient to dispute Defendants' facts.   *Cf. Peru v. T-Mobile USA, Inc.*, 897 F. Supp. 2d 1078, 1085 (D. Colo. 2012) (refusing to consider conclusory assertions of a *pro se* party opposing summary judgment because courts must hold pro se parties to "uniformly-applicable rules of evidence, procedure, and substantive law").

43

The Court notes that, if Plaintiff had presented specific facts indicating that he did not walk towards McRae in an aggressive manner and point his phone in McRae's face in a manner sufficient to place McRae in fear that he might receive an immediate battery, even if those facts were unverified, the Court would not have deemed Defendants' facts admitted.  *See supra* § I.A (holding that the Court would not deem Defendants' facts admitted and that the Court would consider the unverified non-conclusory facts that Plaintiff presented in the body of his response because Plaintiff could likely verify those facts in short order if given the opportunity); *see also Peru*, 897 F. Supp. 2d. at 1084-85 (treating facts not verified under penalty of perjury recited in a pro se party's opposition to a motion for summary judgment as an affidavit sworn to under oath because the court was "satisfied that were [the pro se plaintiff] to be permitted to remedy such defect, she would do so").   Because Plaintiff has not even argued in the body of his response that any such facts exist, and instead only asserts in conclusory fashion that he did not assault McRae, the Court concludes that a reasonable officer in Defendants' position would have believed that he or she had probable cause to arrest Plaintiff for assault on a peace officer.

Plaintiff has failed to assert facts which, if true, constitute a violation of his right to be free from unlawful arrest.   Although Defendants arrested Plaintiff for three crimes—namely, assault on a peace officer, resisting arrest, and disorderly conduct—they only needed to have probable cause to arrest Plaintiff for one of those crimes to sustain their claim of qualified immunity.   *See Morris*, 672 F.3d at 1192.   Because Plaintiff was required to assert facts which, if true, demonstrate that Defendants lacked probable cause to arrest Plaintiff for any crime, and Plaintiff failed to assert such facts, the Court concludes that Plaintiff has failed to satisfy the first prong of his qualified immunity burden with respect to his unlawful arrest claim.

2.      Clearly Established.

Plaintiff's burden to overcome Defendants' assertion of qualified immunity is two-fold. Plaintiff must (1) assert facts which, if true, state a violation of his constitutional rights, and (2) demonstrate that the "right was clearly established at the time such that a reasonable person in the [movant's] position would have known that [the] conduct violated the right." *Garramone v. Romo*, 94 F.3d 1446, 1449 (10th Cir. 1996) (citations omitted).   The Court already has concluded that Plaintiff has asserted facts which, if true, demonstrate that Defendant McRae and Richards unlawfully detained him for investigation without reasonable suspicion, *see supra* § I.B.1.b, but that Plaintiff has not asserted facts which establish that McRae and Richards unlawfully arrested him without probable cause, *see supra* § I.B.1.c.   The Court now evaluates whether Plaintiff has satisfied the second part of his qualified immunity burden.

a.      Investigative Detention.

Having held that Plaintiff has satisfied his burden of overcoming McRae and Richards' assertion of qualified immunity by alleging facts which, if true, constitute a violation of his right to be detained for investigation only upon reasonable suspicion, the Court next must determine whether this right was clearly established such that a reasonable person in McRae and Richards' position would have known that their conduct violated Plaintiff's rights.   *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).   "'[T]he right [Defendants are] alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:   The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'"   *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)). The Tenth Circuit has held that for a right to be "particularized," there "ordinarily . . . must be a

Supreme Court or Tenth Circuit opinion on point." *Garramone*, 94 F.3d at 1451.  That is not to say, however, that "the very action in question [must have] previously been held unlawful" for a plaintiff to defeat qualified immunity, *Anderson*, 483 U.S. at 640, but rather that in light of preexisting law, the unlawfulness was apparent.  In conducting this inquiry, the "right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citation omitted).  It is inappropriate for a court to define clearly established law at a high level of generality. *See Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004).

Defendants McRae and Richards argue that "Tenth Circuit and Supreme Court precedent clearly sets that reasonable suspicion can be predicated upon innocent activity and that officers may use firearms, handcuffs, and other forceful technique to effect the detention when the circumstances reasonable warrant such measures." [Doc. 60 at 24 (citing *Terry*, 392 U.S. 1; *Oliver*, 209 F.3d 1179)].  The Court concludes, however, that reasonable officers in Defendants' position would have known that the acts of sitting in a parked car on a public street for 45 minutes in front of a nightclub hosting an eighteen-and-over party are innocent when considered both alone and together and that these acts are not like the combined acts giving rise to reasonable suspicion in *Terry*, *Sokolow*, and *Oliver*.  Indeed, reasonable officers in Defendants' position would have realized—in light of preexisting law—that the facts gave rise only to an inchoate and unparticularized suspicion and that detaining Plaintiff on this type of hunch would violate Plaintiff's Fourth Amendment rights.  The Court further concludes that the contours of the right Defendants violated was particularized because, at the time of McRae's and Richards' actions, the Tenth Circuit had held that inchoate and unparticularized suspicion does not satisfy the Fourth

Amendment.  *See U.S. v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (reasonable suspicion "requires considerably less than proof of wrongdoing by a preponderance of the evidence, but something more than an inchoate and unparticularized suspicion or hunch.") (internal quotations omitted).

For these reasons, the Court holds that Plaintiff has satisfied the second part of his qualified immunity burden of demonstrating that McRae and Richards' violation of his right to be free from unlawful detention was clearly established, in a particularized way, such that a reasonable officer in their position would have known that the acts violated Plaintiff's rights.  Accordingly, having concluded that Plaintiff has fulfilled both parts of his two-part burden of overcoming McRae and Richards' assertion of qualified immunity on his claim for unlawful investigative detention, the Court denies McRae and Richards' Motion for Summary Judgment on Plaintiff's unlawful detention claim.

b.   <u>Arrest</u>.

The Court has held that Plaintiff has not alleged facts which, if true, state a violation of his constitutional right to be free from arrest without probable cause.  *See supra* § I.B.1.c.  Plaintiff's failure to satisfy the first prong of his qualified immunity burden precludes Plaintiff from overcoming Defendants' assertion of qualified immunity from his Section 1983 unlawful arrest claim.  *See Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001) ("If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant . . . qualified immunity.").  Thus, the Court grants McRae and Richards' Motion for Summary Judgment on Plaintiff's unlawful arrest claim without considering whether Plaintiff has satisfied the second part of his qualified immunity burden of demonstrating that the constitutional right allegedly violated was clearly established.

47

C.    Defendants are Entitled to Qualified Immunity from Plaintiff's Section 1983 Claim
      for Malicious Prosecution.

To satisfy the first part of his burden to withstand Defendants' assertion of qualified immunity on his Section 1983 claim for malicious prosecution, Plaintiff must point to facts which, if true, constitute a violation of his Fourth and Fourteenth Amendment rights.   In the Tenth Circuit, when addressing a Section 1983 malicious prosecution claim, a court uses the common law elements of malicious prosecution as the "starting point" of its analysis.   *See Novitsky v. City of Aurora*, 491 F.3d 1244, 1257 (10th Cir. 2007); *Talyor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir.), *cert. denied*, 519 U.S. 871 (1996).   The ultimate question remains, however, whether a plaintiff has proven the deprivation of a constitutional right.   *See Novitsky* , 491 F.3d at 1257-58; *Taylor*, 82 F.3d at 1561.   A court looks to both the Fourth and Fourteenth Amendments to evaluate a malicious prosecution claim.   *See Novitsky*, 491 F.3d at 1258 (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1285-86 (10th Cir. 2004) ("The initial seizure is governed by the Fourth Amendment, but at some point after arrest . . . constitutional analysis shifts to the Due Process Clause.")).   The elements of the common law tort of malicious prosecution relevant to a Section 1983 claim are as follows:   (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.   *See id.* (citation omitted).

The Court already has held that, on the facts construed in Plaintiff's favor, McRae and Richards had probable cause to arrest Plaintiff for assault on a peace officer.   Because the presence of probable cause to arrest defeats a malicious prosecution claim, *see id.*, the Court holds that Plaintiff has failed to satisfy the first part of his qualified immunity burden of asserting facts

that constitute a violation of a constitutional right.   Because Plaintiff has failed to satisfy the first

part of his burden, and this failure is dispositive, the Court grants McRae and Richards' motion for

summary judgment on the malicious prosecution claim.   *Cf. Gross*, 245 F.3d at 1156.

> D.   Defendants are Entitled to Qualified Immunity from Plaintiff's Section 1983 Claim for Retaliatory Arrest.

In determining whether Plaintiff has satisfied his two-part burden to overcome Defendants'

assertion of qualified immunity, the Court can consider either prong of the qualified immunity

burden first.   *See Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010).   Because the

second prong of this test is determinative of the question whether McRae and Richards are immune

from Plaintiff's claim for retaliatory arrest, the Court addresses that prong first.

In *Reichle v. Howards*, the Supreme Court specifically held that there is no clearly

established "First Amendment right to be free from a retaliatory arrest that is supported by

probable clause."   132 S. Ct. 2088, 2093 (2012).   Specifically, the Court stated that it has "never

recognized" such a right, and that, in the Tenth Circuit, "it [is] not clearly established that an arrest

supported by probable cause could give rise to a First Amendment violation."   *Id.* at 2093, 2097.

In *Moral v. Hagen*, a case decided earlier this year, the Tenth Circuit confirmed that the Supreme

Court in *Reichle* "[o]nly recently . . . explained that it remains unsettled under current law whether

an officer violates the Fourth Amendment by initiating an arrest for retaliatory reasons when the

arrest itself happens to be supported, as an objective matter, by probable cause."   No. 13-3129,

553 Fed. Appx. 839, 840 (10th Cir. Jan. 31, 2014) (citing *Reichle*, 132 S. Ct. 2088).   Relying upon

the Supreme Court's *Reichle* decision, the Tenth Circuit held that the defendant-police officer did

not violate clearly established law when he arrested the plaintiff in retaliation for exercising her

First Amendment rights.   *See id.*

The Court concludes that, if as recently as the Supreme Court's 2012 decision in *Riechle* and the Tenth Circuit's 2014 decision in *Moral*, it was not clearly established that an individual has a First Amendment right to be free from a retaliatory arrest when the arrest is supported by probable clause, it certainly was not clearly established on September 23, 2009, that an individual has such a right.   Because Plaintiff has failed to establish the second prong of his burden to oppose Defendants' assertion of qualified immunity on his First Amendment retaliatory arrest claims, and because this failure is fatal, the Court grants McRae and Richards' motion seeking summary dismissal of these claims.   *Cf. Gross*, 245 F.3d at 1156.

E.      Defendants are Not Entitled to Qualified Immunity from Plaintiff's Section 1983 Claims for Excessive Force.

Defendants McRae and Richards argue that Plaintiff has not satisfied the first part of his burden of overcoming their assertion of qualified immunity from Plaintiff's Section 1983 claim for excessive force because Plaintiff has not asserted facts showing (1) that his injury was beyond de minimis and (2) that the force Defendants used was unreasonable.   [Doc. 60 at 21-23]. Defendants also contend that Plaintiff has not satisfied the second part of his qualified immunity burden of demonstrating that his right to be free from excessive force was clearly established because a reasonable officer in Defendants' position would not have been on notice that displaying a firearm, handcuffing a suspect, or using approved police procedures and tactics such as the taser and face-down stabilization technique to subdue a suspect actively resisting arrest violates the Fourth Amendment or that an excessive force claim can proceed if the Plaintiff suffers only de minimis injuries as a result of the use of police force.   [*Id.* at 25].   The Court rejects these arguments and holds that Plaintiff has satisfied his burden of overcoming McRae's and Richards' assertion of qualified immunity from his excessive force claims against them.

50

1.     Constitutional Violation.

a.     Plaintiff's Injuries are not De Minimis.

Defendants argue that Plaintiff only sustained a "minor abrasion on his forehead and a scape on his knee from this encounter," and that this lack of injury prevents Plaintiff from satisfying his initial burden of asserting facts which, if true, constitute a violation of his constitutional right to be free from excessive force.   [Doc. 60 at 21].   In support of this argument, Defendants cite *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007), in which the Tenth Circuit, in evaluating a tight handcuffing claim, held "that a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional."   *Id.*   The court explained that "[t]he only evidence in the record [was the plaintiff's] affidavit that the handcuffs left red marks that were visible for days afterward," and held that "[t]his [was] insufficient, as a matter of law, to support an excessive force claim if the use of handcuffs is otherwise justified."   *Id.*[10]

*Cortez* is distinguishable, however, for two reasons.   First, *Cortez* involved a handcuffing excessive force claim in which the handcuffing was otherwise justified.   Plaintiff here, however, asserts an excessive force claim premised upon substantially more force than simple handcuffing. Plaintiff indicates that when he started taking pictures of the officers and asking them for their names and badge numbers, the officers tackled him, struck, kicked, and twisted his legs, ankle, and arms, and slammed his head into a rust-iron grate inlayed in the sidewalk's concrete causing his forehead to become cut and gush blood.   [Doc. 67 at 3-4].

Second, Plaintiff here presents evidence that he suffered actual injury, and not simply the

---

[10]   The *Cortez* court noted that "proof of physical injury manifested by visible cuts, bruises, abrasions or scars, is not an essential element of an excessive force claim," but explained that "the absence of injury in the context of the totality of the circumstances may suggest the absence of excessive force."   478 F.3d at 1129 n.24 (citing *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1195 (10th Cir. 2001)).

"red marks" at issue in *Cortez*, as a result of his encounter with Defendants. Plaintiff's medical records indicate that Plaintiff had a two-inch laceration on his head, that he had several other abrasions around his head and scalp, that he had tenderness and abrasions on his back, that he had bruising in the antecubital fossa of his left arm, that he had bruising and abrasions on both legs, and that he had swelling of his left ankle. [Doc. 68 at 14-26]. The Court concludes that Plaintiff has asserted facts which, if true, demonstrate that he suffered actual injury sufficient to support an excessive force claim. Accordingly, the Court rejects Defendants' argument that Plaintiff has not satisfied the first part of his qualified immunity burden because his injuries were de minimis.

b.     The Force Used Was Not Reasonable.

Defendants McRae and Richards next argue that they are entitled to summary judgment in their favor because Plaintiff has failed to assert facts which, if true, show that they used unreasonable force in violation of the Fourth Amendment. In *Graham v. Connor*, the Supreme Court held that the use of excessive force during arrest violates a person's Fourth Amendment right against unreasonable search and seizure, and that all excessive force claims should be analyzed under the reasonableness standard of the Fourth Amendment. *See* 490 U.S. 386, 395 (1989). The Fourth Amendment reasonableness inquiry is objective and heavily fact dependent. *See, e.g., Wilson v. Meeks*, 52 F.3d 1547, 1553 (10th Cir. 1992). It also recognizes that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, . . . [and it] must embody allowance for the fact that police officers are often forced to make split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396-97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . [,] violates the Fourth Amendment." *Id.* at 396. A court must pay careful attention to the

totality of the facts and circumstances of each particular case, including but not limited to the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officer, and whether the subject is resisting arrest by flight.   *See id.* (citation omitted).

The Court concludes that the undisputed facts before it establish that the first and third *Graham* factors weigh in favor of Plaintiff.   Defendants charged Plaintiff with committing three misdemeanor offenses, none of which are, relatively speaking, severe crimes.   Moreover, the facts do not indicate that Plaintiff was resisting arrest by attempting to flee the scene.   Rather, even on Defendants' facts, Plaintiff only was resisting McRae's attempt to grab Plaintiff's cell phone and the individual Defendants' attempts to handcuff him.   Defendants do not assert that Plaintiff was attempting to flee the scene, but rather maintain the opposite—*i.e.*, that Plaintiff refused to leave the scene after they informed him that he was free to leave.

The Court also concludes that the second *Graham* factor weighs in Plaintiff's favor on the question of excessive force.   Although Defendants contend that Plaintiff assaulted McRae with his cell phone and resisted Defendants' attempts to handcuff and arrest him, the qualified immunity inquiry requires the Court to examine whether Plaintiff's asserted facts, if true, demonstrate that he posed an immediate threat to the safety of the officers.

Plaintiff asserts only that he started taking pictures of the individual Defendants, for the purpose of identifying them, because they refused to provide Plaintiff with their names and badge numbers.   Plaintiff maintains that the individual Defendants objected to him photographing them and informed Plaintiff he could not do so and that the officers attacked him and attempted to obtain the cell phone from him because they did not want him to take photographs.   Plaintiff further asserts that, in response only to his action of taking these photographs, McRae and Richards tackled him, struck, kicked, and twisted his legs, ankle, and arms, and slammed his head into a

rust-iron grate inlayed in the sidewalk's concrete.  Plaintiff maintains that he did not resist the individual defendants' attempts to handcuff or restrain him in any way.   The Court concludes that, on these facts, no reasonable officer in Defendants' position could have believed that Plaintiff posed an immediate threat to their safety or to the safety of others sufficient to justify their use of the force Plaintiff describes.

The three *Graham* factors weigh in Plaintiff's favor.  For this reason, and because a reasonable officer, under the totality of the circumstances, would not have concluded that it was appropriate to use the force of tacking Plaintiff, striking, kicking, and twisting his limbs, slamming his head into a concrete side walk, using a taser multiple times, and applying the face-down stabilization technique when Plaintiff had only attempted to take their pictures and was not resisting them in any way, the Court holds that Plaintiff has asserted facts which, if true, constitute a violation of his Fourth Amendment right to be free from excessive force.

### 2.   Clearly Established.

The Court next determines whether Plaintiff has established the second part of his qualified immunity burden of establishing that his right to be free from excessive force was clearly established in a more particularized sense, such that a reasonable official in the individual Defendants' position would have understood that they were violating Plaintiff's rights.   *Cf. Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).   McRae and Richards contend that it is not clearly established "that excessive force occurs when an officer displays a firearm, handcuffs a suspect [who] is being detained, or uses approved police procedures and tactics such as the taser and the face down stabilization technique to subdue a suspect who is actively resisting arrest."   [Doc. 60 at 25].   Moreover, they contend that "[t]here is also no clearly established law which holds that an excessive force claim can proceed if the alleged injuries are de minimis."   [*Id.* (citation omitted)].

54

These assertions are problematic.  First, with respect to the first contention, the proviso "who is actively resisting arrest" is not applicable to the Court's assessment whether Plaintiff has satisfied his qualified immunity burden, because it is Plaintiff's assertion of the facts (and not Defendants') which governs the Court's analysis, and on Plaintiff's facts, Plaintiff was not actively resisting Defendants' attempts to handcuff or arrest him.  Thus, although it may not be clearly established in this Circuit that the display of a firearm or the use of handcuffs, a taser, or a face-down stabilization technique against a suspect *who is actively resisting arrest* constitutes excessive force, this is irrelevant because Plaintiff was not, on the facts asserted by Plaintiff, actively resisting arrest.  Second, although there may be no clearly established law in which Circuit which holds that an excessive force claim can proceed if the alleged injuries are de minimis, this too is irrelevant because, as the Court has explained, Plaintiff has asserted facts demonstrating that his injuries were not de minimis.  *See supra* § I.E.1.a.

It was, however, clearly established in this Circuit at the time of Plaintiff's encounter with Defendants that it is unreasonable to use the force of tackling a person, striking, kicking, or twisting a person's limbs, slamming a person's head into a sidewalk with enough force to cause a two-inch bleeding gash, using a taser multiple times on the person, and applying the face-down stabilization technique when that person is not resisting officers' attempts to restrain or handcuff him, or to take an object (*i.e.*, cellular telephone) away from him.  A reasonable officer in the individual Defendants' position would have known that this use of force violated Plaintiff's rights and the unlawfulness of the conduct would have been apparent in light of preexisting law.

For these reasons, the Court holds that Plaintiff has satisfied the second part of his qualified immunity burden of demonstrating that McRae and Richards' violation of his right to be free from excessive force was clearly established, in a particularized way, such that a reasonable officer in

55

their position would have known that these acts violated Plaintiff's rights.   Accordingly, having concluded that Plaintiff has fulfilled both parts of his two-part burden of overcoming Defendants' assertion of qualified immunity on his claims of excessive force, the Court denies McRae and Richards' Motion for Summary Judgment on these claims.

II.   Metzgar's Motion for Summary Judgment.

Plaintiff brings claims pursuant to 42 U.S.C. Section 1983 against Defendant Metzgar for wrongful seizure and arrest in violation of the Fourth Amendment, for malicious prosecution in violation of the Fourth and Fourteenth Amendments, for retaliatory arrest in violation of the First Amendment, and for excessive force in violation of the Fourth Amendment.   Metzgar asks the Court to dismiss all of Plaintiff's claims against him on the ground that Plaintiff has failed to satisfy his burden of overcoming Metzgar's assertion of qualified immunity.

First, Metzgar maintains that he is entitled to qualified immunity on the Section 1983 claim for unlawful detention because it was McRae, and not Metzgar, who initially placed Plaintiff in handcuffs while conducting the investigative detention, and because McRae's actions of investigating, detaining, and handcuffing Plaintiff were reasonable.   [Doc. 64 at 8].   Metzgar argues that he is entitled to qualified immunity on the unlawful arrest claim, because the facts demonstrate that he had probable cause to arrest Plaintiff.   [*Id.* at 8-10].   Second, Metzgar contends that he is entitled to qualified immunity on the malicious prosecution claim because Plaintiff has not alleged facts that satisfy the element of a malicious prosecution claim which requires a lack of probable cause to conduct the original arrest.   [*Id.* at 13].   Third, Metzgar argues that he is entitled to qualified immunity on the retaliatory arrest claim because Plaintiff has not alleged facts which demonstrate that he was arrested without probable cause and because the facts do not establish that Metzgar's actions were substantially motivated as a response to

56

Plaintiff's exercise of his First Amendment rights.   [*Id.* at 13-14].   Fourth, Metzgar maintains

that he is entitled to qualified immunity on the excessive force claim because the force he used was

reasonable.   [*Id.* at 11-13].   The Court examines each of Metzgar's arguments in turn.

> A.   Defendant Metzgar is Not Entitled to Qualified Immunity from Plaintiff's Section 1983 Claim for Unlawful Detention but is Entitled to Qualified Immunity from Plaintiff's Claim for Unlawful Arrest.

Defendant Metzgar argues that Plaintiff cannot satisfy his qualified immunity burden of

asserting facts which, if true, constitute a violation of his constitutional right to be free from

unlawful investigative detention and arrest.   [*Id.* at 8-10].   The Court analyzes the investigative

detention and arrest separately because the facts and standards for each of these seizures differ.

> 1.   Investigative Detention.

Metzgar maintains that Plaintiff has not satisfied the first prong of his qualified immunity

burden by alleging facts which, if true, constitute a violation of his constitutional right to be free

from detention without reasonable suspicion because it was Defendant McRae, and not Metzgar,

who initially placed Plaintiff in handcuffs to conduct the investigation.   [Doc. 64 at 8].   Metzgar

also contends that Plaintiff's facts do not assert a constitutional violation because McRae's actions

were "reasonable."   [*Id.*].   The Court is not persuaded by these arguments.

First, that it was McRae, and not Metzgar, who placed Plaintiff in handcuffs does not

immunize Metzgar from a constitutional claim for unlawful detention.   A suspect may be

detained unlawfully both prior to and after being handcuffed and even if the suspect is not

handcuffed at all.   Indeed, any consensual encounter may become an investigative detention,

independent of handcuffing, if the encounter rises to the level of a seizure.   *See Latta v. Keryte*,

118 F.3d 693, 698 (10th Cir. 1997).   "[A] person has been 'seized' within the meaning of the

Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable

person would have believed that he was not free to leave." *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980); *accord Latta*, 118 F.3d at 698.   The Court already has held that Plaintiff was seized within the meaning of the Fourth Amendment—even though he was not handcuffed—when Defendant McRae approached Plaintiff's vehicle at the driver's side window, ordered Plaintiff to roll down his window and thereafter, with a gun aimed either in the low-ready position or at Plaintiff's head, ordered Plaintiff to exit the vehicle. *See supra* § I.B.1.a.   As soon as Plaintiff was seized, the encounter between Plaintiff and the individual Defendants became at least an investigative detention.[11]   Any officers participating in the investigation (and not only the handcuffing) of Plaintiff while he was "seized" was required, at a minimum, to have reasonable suspicion to detain Plaintiff.

The facts asserted by Plaintiff, indeed even those presented by Metzgar, indicate that Metzgar participated in Plaintiff's initial detention.   First, McRae attests that it was only after other officers, including Metzgar, arrived on the scene, that Plaintiff complied with McRae's order to exit the vehicle.   *See supra* at 7-8 & n.3.   Thereafter, Metzgar participated in the detention by running Plaintiff's identification through NCIC.   In addition, Metzgar himself concedes in the criminal complaint he signed under penalty of perjury that both he and McRae conducted the "initial investigation" of Plaintiff.   *See supra* note 3.

In order to detain and investigate Plaintiff, Defendant Metzgar was required to have, at a minimum, reasonable suspicion that criminal activity was afoot.   *See Latta*, 118 F.3d at 699.   To constitute reasonable suspicion, an officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *accord Latta*, 118 F.3d at 699.   "Those facts must tend to show

---

[11]   Plaintiff does not contend that the detention amounted to a de facto arrest.

that the detainee has committed or is about to commit a crime." *U.S. v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004) (citations omitted).

The Court already has concluded that, even on the facts asserted by Defendants, McRae and Richards did not have reasonable suspicion to detain Plaintiff. *See supra* § I.B.1.b. Because the record before the Court does not indicate that Metzgar was aware of additional facts, beyond those to which McRae and Richards were privy, which would support a finding of reasonable suspicion for Metzgar in particular, the Court concludes that its holding that McRae and Richards lacked reasonable suspicion to detain Plaintiff applies equally to Metzgar. The Court, therefore, holds that Plaintiff has satisfied the first part of his qualified immunity burden of asserting facts which, if true, constitute a violation by Metzgar of Plaintiff's right to be detained and investigated only upon reasonable suspicion.

Metzgar does not move for summary judgment on the ground that Plaintiff failed to satisfy the second prong of his qualified immunity burden. Nonetheless, the Court already has held that Plaintiff has satisfied this burden with respect to Defendants McRae and Richards' claim for qualified immunity. *See supra* at I.B.2.a. This holding is equally applicable to Metzgar. Therefore, having held that Plaintiff has satisfied both prongs of his burden of overcoming Metzgar's assertion of qualified immunity, the Court denies Metzgar's Motion for Summary Judgment to the extent it seeks dismissal of Plaintiff's Section 1983 unlawful detention claim.

2. <u>Arrest</u>.

Defendant Metzgar also argues that Plaintiff has not asserted facts which, if true, constitute a violation of his right to be free from unlawful arrest because the officers had probable cause to arrest Plaintiff. [Doc. 64 at 8-9]. The Court already has held, in the context of deciding the McRae and Richards' Motion for Summary Judgment, that on the facts alleged the officers had

probable cause to arrest Plaintiff for assault on a peace officer.   *See supra* § I.B.1.c.   Because the relevant inquiry is whether a reasonable officer would have believed that probable cause existed to arrest the defendant "*based on the information possessed by the arresting officer,*" *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (emphasis added), and because the facts indicate that all three individual Defendants were privy to the same information, the Court's conclusion that McRae and Richards had probable cause to arrest Plaintiff for assault on a peace officer is equally applicable to Metzgar.   The Court's holding that Plaintiff has failed to assert facts which, if true, establish that Metgzar arrested him without probable cause, is dispositive.   *Cf. Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001).   Thus, the Court grants Metzgar's Motion for Summary Judgment to the extent it seeks judgment in Metzgar's favor on Plaintiff's unlawful arrest claim.

> B.   Defendant Metzgar is Entitled to Qualified Immunity from Plaintiff's Malicious Prosecution Claim.

Defendant Metzgar contends that he is entitled to qualified immunity on Plaintiff's malicious prosecution claim because Plaintiff has not alleged facts that satisfy the element of a malicious prosecution claim which requires a lack of probable cause to conduct the original arrest. [Doc. 64 at 13].   The Court already has held that, on the facts construed in Plaintiff's favor, Defendants McRae and Richards had probable cause to arrest Plaintiff for assault on a peace officer and that this holding is equally applicable to Metzgar.   *See supra* § I.B.1.c; § II.A.2. Because the presence of probable cause to arrest a plaintiff defeats a malicious prosecution claim, *see Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007); *see supra* § I.C, the Court holds that Plaintiff has failed to satisfy the first part of his qualified immunity burden.   This holding is dispositive, *cf. Gross*, 245 F.3d at 1156, and the Court therefore grants Metzgar's

motion seeking judgment in his favor on Plaintiff's malicious prosecution claim.

      C.    <u>Defendant Metzgar is Entitled to Qualified Immunity from Plaintiff's Retaliatory Arrest Claim</u>.

Defendant Metzgar argues that he is entitled to qualified immunity on Plaintiff's retaliatory arrest claim because Plaintiff has not alleged facts which demonstrate that he was arrested without probable cause and because the facts do not establish that Metzgar's actions were substantially motivated as a response to Plaintiff's exercise of his First Amendment rights.   [Doc. 64 at 13-14]. Although Metzgar does not contend that he is entitled to judgment on the ground that Plaintiff has failed to satisfy the second prong of his burden, the Court nonetheless concludes that Plaintiff's burden is two-fold.   Because this Court already has held that Plaintiff failed to satisfy the second part of his burden of overcoming Defendants McRae and Richards' assertion of qualified immunity on Plaintiff's retaliatory arrest claim, *see supra* § I.D, and that holding is equally applicable to Defendant Metzgar's assertion of immunity, the Court grants Metzgar's motion seeking judgment in his favor on Plaintiff's Section 1983 retaliatory arrest claim.

      D.    <u>Defendant Metzgar is Not Entitled to Qualified Immunity from Plaintiff's Excessive Force Claim</u>.

Defendant Metzgar maintains that he is entitled to qualified immunity on Plaintiff's excessive force claim because the force he used was reasonable under the circumstances.   [*Id.* at 11-13].   The Court already has held that Plaintiff has asserted facts which, if true, constitute a violation by Defendants McRae and Richards of his constitutional right to be free from excessive force.   *See supra* § I.E.1.   This holding, and the Court's reasoning supporting its holding, is equally applicable to Metzgar, because all three individual Defendants exercised force in response to the same set of circumstances.   The Court, therefore, holds that Plaintiff has satisfied the first part of his qualified immunity burden of asserting facts which, if true, constitute a violation by

Metzgar of Plaintiff's constitutional right to be free from excessive force.

Defendant Metzgar does not move for summary judgment on the ground that Plaintiff failed to satisfy the second prong of his qualified immunity burden.   Nonetheless, the Court already has held that Plaintiff has satisfied this burden with respect to Defendants McRae and Richards.   *See supra* § I.E.2.   This holding, once again, is equally applicable to Metzgar. Therefore, having held that Plaintiff has satisfied both prongs of his burden of overcoming Metzgar's assertion of qualified immunity, the Court denies Metzgar's Motion for Summary Judgment to the extent it seeks dismissal of Plaintiff's Section 1983 excessive force claim.

III.    <u>Supervisory and Municipal Liability Motion for Summary Judgment</u>.

Plaintiff brings claims pursuant to 42 U.S.C. Section 1983 against Defendant McRae for supervisory liability and against the Defendant City of Albuquerque for municipal liability. Specifically, Plaintiff alleges that McRae approved and ordered the actions of his subordinates which, Plaintiff maintains, resulted in the violation of Plaintiff's constitutional rights.   [Doc. 61 at 1].   Moreover, Plaintiff alleges that the City of Albuquerque violated his constitutional rights because it has a policy and practice of (1) using excessive force; (2) denying citizens their First Amendment rights to record and photograph; (3) unlawfully arresting persons; (4) maliciously prosecuting arrestees; (5) failing to account for evidence, including belt tapes and ammunition; (6) failing to provide badge numbers and identification; and (7) failing to supervise and train its officers.   [*Id.* at 2].

In their Supervisory and Municipal Liability Motion for Summary Judgment, McRae and the City of Albuquerque seek dismissal with prejudice of Plaintiff's supervisory and municipal liability claims against them.   Specifically, McRae asks the Court to dismiss the supervisory claims against him in his individual capacity on the ground that he is shielded by qualified

immunity because no underlying constitutional violation occurred.   The City of Albuquerque asks the Court to dismiss the municipal liability claims against it on the ground that no underlying constitutional violation occurred and on the ground that, even if it had, Plaintiff has failed to produce evidence indicating that a municipal policy or custom that was the moving force behind the violation or that the City acted with deliberate indifference.

A.   Defendant McRae is Not Entitled to Qualified Immunity from Plaintiff's Supervisory Liability Claim Against Him.

Defendant McRae moves for summary judgment on Plaintiff's Section 1983 supervisory liability claims against him on the ground that Plaintiff has failed to satisfy his burden of overcoming McRae's assertion of qualified immunity from these claims.   To determine whether Plaintiff has asserted facts that state a constitutional violation by McRae in his capacity as a supervisor, the Court first must set forth the law regarding supervisory liability under Section 1983.

In *Dodds v. Richardson*, decided in 2011, the Tenth Circuit summarized its view of the law after the Supreme Court's decision in *Ashcroft v. Iqbal*, 131 S. Ct. 2150 (2011).   *See* 614 F.3d 1185, 1194 (10th Cir. 2011).   Prior to *Iqbal*, to impose Section 1983 liability, the plaintiff first had to establish "the supervisor's subordinates violated the [C]onstitution,"   *Serna v. Colo. Dep't of Corrections*, 455 F.3d 1146, 1151 (10th Cir. 2006) (internal quotations omitted), and the plaintiff then was required to demonstrate "an 'affirmative link' between the supervisor and the violation," *id.*   The *Dodds* court explained, "Over time, this 'affirmative link' requirement came to have three related prongs:   (1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind."   614 F.3d at 1195.   A plaintiff could establish the first prong of this test—*i.e.*, the defendant-supervisor's personal involvement, by demonstrating personal

participation, the exercise of control or direction, a failure to supervise, or the knowledge of a violation and acquiescence in its continuance. *See id.* (citing *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996)). A defendant supervisor's promulgation, creation, implementation, or utilization of a policy that caused a deprivation of plaintiff's rights also was sufficient to constitute personal involvement. *See id.* (citations omitted). A plaintiff could establish the third prong—*i.e.*, that the supervisor had a culpable state of mind—by demonstrating that "the supervisor acted knowingly or with 'deliberate indifference' that a constitutional violation would occur." *Serna*, 455 F.3d at 1151, 1154; *accord Dodds*, 614 F.3d at 1196.

The *Dodds* court explained that post-*Iqbal*, a plaintiff may succeed in a § 1983 suit against a defendant-supervisor by showing that (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation. *See id.* at 1199-1200 (citations omitted). The *Dodds* court explained, "Denying qualified immunity on the basis of such a showing complies with *Iqbal*'s requirement that § 1983 liability only be imposed upon those defendants whose own individual actions cause a constitutional deprivation because it requires plaintiffs prove each defendant took some act with the constitutionally applicable state of mind that caused the alleged constitutional violation." *Id.* at 1200.

The *Dodds* court defined the first requirement of a Section 1983 supervisory liability claim as a showing that "the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy." *Id.* at 1199-1200. In *Dodds*, however, the theory of the plaintiff's case charged the supervisor with responsibility for an unconstitutional policy the enforcement of which violated the plaintiff's rights and did not charge the supervisor with personal

involvement in the deprivation of the plaintiff's rights or with directing others to violate the plaintiff's rights. *See id.* at 1194. The *Dodds* court explained that *Iqbal* did not "alter the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." *Id.* at 1200. Thus, the pre-*Iqbal* bases for establishing personal involvement—*i.e.*, personal participation, the exercise of control or direction, the failure to supervise, or acquiescence in a continued violation, in addition to the establishment of a policy or custom—are still viable methods of stating a constitutional violation by a supervisor, and the pre-*Iqbal* law regarding causation also is applicable. *See id.* at 1200 (explaining that *Iqbal* did not alter personal involvement analysis); *id.* at 1199 (in the context of describing precisely what theory of supervisory liability survives *Iqbal*, citing the District of Colorado's opinion in *Davis v. City of Aurora*, 705 F. Supp. 2d 1243, 1263-64 (D. Colo. 2010), for the proposition that it is not only personal participation by a supervisor or the exercise of control or direction by the supervisor that can support a post-*Iqbal* claim, but rather also the establishment of an unconstitutional policy or custom). *Iqbal* changed only the required state of mind from a showing pre-*Iqbal* that "the supervisor acted knowingly or with 'deliberate indifference' that a constitutional violation would occur," *Serna*, 455 F.3d at 1151, 1154; *accord Dodds*, 614 F.3d at 1196, to a showing post-*Iqbal* that the supervisor acted "with the state of mind required to establish the alleged constitutional deprivation," *id.* at 1199-1200.

Defendant McRae contends that Plaintiff cannot overcome McRae's assertion of qualified immunity on Plaintiff's supervisory liability claims against him because (1) there was no underlying constitutional violation by the individual defendants and thus there can be no constitutional infraction by McRae as a supervisor, [Doc. 61 at 9], and (2) Defendant McRae was "objectively reasonable in giving directives to officers to restrain Plaintiff since he was actively

resisting arrest," [*id.*].   Under either the pre- or post-*Iqbal* tests, a plaintiff attempting to overcome an assertion of qualified immunity on a supervisory liability claim must establish that "the supervisor's subordinates violated the [C]onstitution," *Serna*, 455 F.3d at 1151 (internal quotations omitted), and next must establish a causal link between the supervisor and the violation, *id.*

Although McRae contends that there is no underlying constitutional violation and maintains that this precludes Plaintiff's supervisory claim against him, the Court already has rejected this argument.   Specifically, the Court has held that, on the facts construed Plaintiff's favor, the individual Defendants violated Plaintiff's Fourth Amendment rights to be free from unlawful investigative detention and from excessive force.   *See supra* §§ I.B.1.b, I.E.1.   Thus, McRae's argument that the Court should dismiss Plaintiff's supervisory liability claim against him on the ground that Plaintiff has failed to assert an underlying constitutional violation is not persuasive.

McRae's second argument that the Court should dismiss the supervisory liability claim against him on the ground that McRae was "objectively reasonable in giving directives to officers to restrain Plaintiff since he was actively resisting arrest," [Doc. 61 at 9], likewise is unavailing. The Court has concluded that the individual Defendants, including McRae, used an unreasonable amount of force because the facts construed in Plaintiff's favor do not indicate that he was resisting police efforts to handcuff or arrest him.   *See supra* § I.E.1.b.   The Court likewise concludes that McRae's instructions to Richards and Metzgar to restrain Plaintiff (through tactics such as the taser and the face-down stabilization technique) when Plaintiff's facts demonstrate that Plaintiff was not resisting the officers was not reasonable under the Fourth Amendment for the same reasons the Court concluded that the force used was not reasonable.   *See id.*   Thus, the Court

rejects McRae's second argument that the Court should dismiss Plaintiff's supervisory liability claim on the ground that McRae's actions were objectively reasonable under the Fourth Amendment.  Having rejected both of McRae's argument in support of his claim that he is entitled to qualified immunity on Plaintiff's supervisory claim, the Court denies McRae's motion for summary judgment on Plaintiff's supervisory claim.

In his motion for summary judgment on the supervisory claim, McRae does not argue that Plaintiff has failed to overcome his qualified immunity burden on any other basis than that Plaintiff failed to establish an underlying constitutional violation.  The Court nonetheless concludes that Plaintiff has satisfied the first part of his qualified immunity burden because he has asserted facts which establish all three prongs of the post-*Iqbal* supervisory liability inquiry.  *See Dodds*, 614 F.3d at 1195, 1199-1200.

On Plaintiff's facts, McRae was personally involved in the alleged constitutional violations of Plaintiff's rights and he also directed Metzgar and Richards to act in a manner that violated Plaintiff's rights.  Moreover, because the culpable conduct asserted by Plaintiff itself violates the Constitution, this conclusion necessarily determines that McRae's acts as a supervisor were the cause of the complained of harm.  *See id.* at 1200 n.8 (explaining that the three showings to establish supervisory liability are not distinct analytical prongs and that when a plaintiff claims that the particular supervisory action itself violates federal law or directs an employee to do so, the conclusion that the plaintiff has asserted a constitutional violation necessarily determines that the supervisory action caused the plaintiff's injury) (citation omitted); *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404-05 (1997) (explaining that "[w]here a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward," and that "the conclusion that the action taken or directed

67

by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains").   Finally, because, on Plaintiff's facts, McRae himself violated Plaintiff's rights to be free from unlawful detention and excessive force, that determination necessarily establishes that McRae acted with the state of mind required to establish the constitutional violation.   *See Dodds*, 614 F.3d at 1200 n.8 (explaining that where a plaintiff claims that a supervisory action itself violates federal law, issues of culpability are straightforward); *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("The Supreme Court observed in *Brown* that when an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question.").

The Court also concludes that Plaintiff has satisfied the second part of his burden of establishing that his supervisory liability claim was clearly established such that a reasonable supervisor in McRae's position should not have known that his conduct violated Plaintiff's rights. It has long been the law that a supervisor who personally participates in a constitutional violation or directs his or her subordinates to engage in acts which violate constitutional rights may be held liable for that conduct, *see, e.g.*, *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988) (holding in 1988 that to "establish a supervisor's liability under § 1983 [a plaintiff] must show that 'an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise"), and that causation and culpability are necessarily determined when the plaintiff asserts facts establishing that the supervisory act itself violates the law, *see Brown*, 520 U.S. at 404-05 (holding in 1997 that when a plaintiff asserts that a particular action of a municipal actor violates the law, issues of causation and culpability are straightforward).   For these reasons, the Court concludes that Plaintiff has

68

satisfied his burden of overcoming McRae's assertion of qualified immunity from Plaintiff's supervisory liability claim against him.

B.     Municipal Liability Claims.

Plaintiff brings a Section 1983 municipal liability claim against Defendant City of Albuquerque.   In *Monell v. Department of Social Services*, the Supreme Court held that a plaintiff may sue a municipality for damages under Section 1983 when "the action that is alleged to be unconstitutional implements a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decision-making channels."   436 U.S. 658, 690-91 (1978).   A municipality, however, may not be held liable under Section 1983 solely because its officers inflicted injury.  *See Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006).   Rather, to establish municipal liability, a plaintiff must demonstrate that (1) an officer committed an underlying constitutional violation, (2) a municipal policy or custom exists, and (3) there is a direct causal link between the policy or custom and the injury alleged—*i.e.*, that the policy or custom was the "moving force" behind the alleged injury.   *See id.*; *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

The City of Albuquerque maintains that it is entitled to summary judgment on Plaintiff's municipal liability claims against it on the ground that (1) the individual Defendants did not violate Plaintiff's constitutional rights, and (2) even if Plaintiff has asserted facts which, if true, establish that the individual Defendants violated Plaintiff's constitutional rights, Plaintiff has not established (a) that a municipal policy or custom exists, (b) that this policy or custom was the moving force behind the alleged constitutional infraction, or (c) that the City acted with deliberate indifference.   [Doc. 61 at 10].   The Court is not persuaded by the City's first argument because

69

the Court already has held that the facts construed in Plaintiff's favor assert a violation of Plaintiff's constitutional rights to be free from unlawful investigative detention and excessive force.   The Court, however, agrees with the City's second and fourth arguments that Plaintiff has failed to point to facts which establish the existence of a municipal policy or custom or which establish that the City acted with deliberate indifference.   The Court, therefore, grants the City's motion for summary judgment on these grounds.   Because this holding is dispositive, the Court need not—and therefore does not—consider the City of Albuquerque's additional argument that Plaintiff has failed to point to facts which establish causation.

The "official policy" requirement was "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).   "A challenged practice may be deemed an official policy or custom for § 1983 municipal-liability purposes if it is a formally-promulgated policy, a well-settled custom or practice, a final decision by a municipal policymaker, or deliberately indifferent training or supervision." *Schneider v. City of Grand Junction Police Dep't*, Nos. 12-1086, 12-1115, 2013 WL 2421071, *7 (10th Cir. June 5, 2013).   A policy is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy." *Pembaur*, 475 U.S. at 483-84.   A course of conduct not expressly authorized by law constitutes "custom" with the force of law where it is "permanent" and "well settled." *Monell*, 436 U.S. at 691 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

The City of Albuquerque argues, and the Court agrees, that Plaintiff has failed to identify facts which establish that the City had a specific policy or custom that itself caused the individual

Defendants to violate Plaintiff's constitutional rights.   *See* Brown, 520 U.S. at 404-05 (holding

that "when an official municipal policy itself violates federal law, issues of culpability and

causation are straightforward; simply proving the existence of the unlawful policy puts an end to

the question").   Although Plaintiff claims in conclusory form that Defendant City of Albuquerque

violated his constitutional rights because it has a policy and practice of (1) using excessive force;

(2) denying citizens their First Amendment rights to record and photograph; (3) unlawfully

arresting persons; and (4) maliciously prosecuting arrestees; [Doc. 61 at 2], Plaintiff presents no

evidence of any such policies or practices.   The City of Albuquerque, in contrast, has attached to

its Supervisory and Municipal Liability Motion for Summary Judgment its written policies and

code of conduct pertaining to supervision, training, the use of force, the rights of bystandards, the

securing of belt tapes and other evidence, and the protocols for search and seizure.   *See supra* at

12-14.   These policies are lawful on their face, and, in the absence of any contrary evidence from

Plaintiff of a policy that itself violates federal law, the Court concludes that the undisputed facts

show that the City's policies are not facially unconstitutional.

The Court next addresses whether the City's policies, although neutral on their face, were

applied in a manner that violated Plaintiff's rights.   To the extent Plaintiff contends that the City

of Albuquerque is liable pursuant to an inferred policy of authorizing police misconduct because it

failed to supervise and train its employees, [Doc. 61 at 2], the Court holds that Plaintiff presents no

evidence to support this claim.   Courts have interpreted *Monell* to hold that a plaintiff can sustain

a failure to supervise or train theory by inferring a municipal policy of authorizing or condoning

police misconduct from the municipality's display of deliberate indifference in the supervision or

training of its police force. *See, e.g.*, *Schneider*, 2013 WL 2421071, *7 (explaining that "a

plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal

action has led an employee to violate a plaintiff's rights," *e.g.*, through a failure to supervise or train, must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences") (citing *Brown*, 520 U.S. 407; *City of Canton*, 489 U.S. at 389); *Barney*, 143 F.3d at 1307 (holding that when an official policy does not itself violate federal law and instead is lawful on its face, *e.g.*, such as when the municipality is allegedly liable under a failure to train or inadequate hiring theory, the plaintiff must demonstrate deliberate indifference). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."[12]   *Id.*   "In most instances, notice can be established by proving the existence of a pattern of tortious conduct," but "[i]n a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]"   *Id.*

Plaintiff has not presented any evidence, and indeed has not even argued, that those narrow circumstances apply here or that a violation of federal rights was a highly predictable or consequence on the City of Albuquerque's failure to supervise or train.   Thus, to establish notice, Plaintiff was required to prove the existence of a pattern of tortious conduct and not simply an isolated instance.   *See, e.g., Adickes*, 398 U.S. at 167 ("we think it clear that a 'custom or usage, of (a) State' for purposes of s 1983 must have the force of law by virtue of the persistent practices of state officials"); *City of Canton*, 489 U.S. at 390-91 (explaining that an isolated instance of failure

---

[12]   For individual defendants, the applicable state of mind will depend on the type of constitutional violation at issue.   *See Iqbal*, 556 U.S. at 676; *Dodds*, 614 F.3d at 1204-05; *Schneider*, 2013 WL 2421071, at *8 n.5.   In contrast, the prevailing state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation.   *See id.*

to train a particular officer is not sufficient to infer a policy of failing to train officers); *Wellington*, 717 F.2d at 936 (explaining that "[g]enerally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse," and "[o]nly then may knowledge be imputed to the supervisory personnel") (citing *Bowen v. Watkins*, 669 F.2d 979, 988-89 (5th Cir. 1982); *McLaughlin v. City of LaGrange*, 662 F.2d 1385, 1388 (11th Cir. 1981), *cert. denied,* 456 U.S. 979 (1982)); *Wellington v. Daniels*, 717 F.2d 932, 936 (2d Cir. 1983) (explaining that "[g]enerally, a failure to supervise gives rise to § 1983 [municipal] liability, however, only in those situations in which there is a history of widespread abuse").   Plaintiff has pointed to no facts establishing that the City of Albuquerque has engaged in a pattern of failing to supervise its police force.

The City of Albuquerque satisfied its initial summary judgment burden of demonstrating that there is an absence of evidence to support Plaintiff's claim that the City maintained either a policy or custom that itself violated Plaintiff's rights or that the City failed to supervise or train its employees in a manner that was deliberately indifferent to Plaintiff's constitutional rights.   To withstand summary judgment, Plaintiff was required to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial" on the question of a municipal policy or custom.   The Tenth Circuit, however, has cautioned that district courts must take care to protect the rights of *pro se* litigants in the context of summary judgment, *see, e.g.*, *Jaxon v. Circle K. Corp.*, 773 F.2d 1138, 1140 (10th Cir. 1985); *supra* at § I.A.   To this end, the Court has held that, where Plaintiff at least identifies facts in the body of his responsive papers, even if the facts are not presented in the manner contemplated by the Federal and Local Rules, the Court will consider those facts as properly before the Court to dispute the facts presented by Defendants.   *See supra* §

I.A.   Plaintiff, however, has identified no facts whatsoever, not even unverified or otherwise inadmissible facts, to establish that the City had a facially unconstitutional official policy or custom or that the City can be held liable for an unconstitutional application of an otherwise lawful policy because it was deliberately indifferent to the risk of harm.   Thus, because Plaintiff has failed to refute the City's facts, and the City's facts show that it is entitled to judgment in its favor on Plaintiff's municipal liability claim, the Court grants the City of Albuquerque's motion for summary judgment on Plaintiff's municipal claim.

## **CONCLUSION**

For the foregoing reasons, IT THEREFORE IS ORDERED that the City Defendants Jeremy McRae and Joshua Richards' Motion for Summary Judgment Requesting Dismissal of Plaintiff's Complaint, and Memorandum in Support, filed December 13, 2013 [Doc. 60], is GRANTED IN PART and DENIED IN PART as follows:

(1)     The Court denies the motion to the extent it seeks dismissal of Plaintiff's Section 1983 claim for unlawful investigative detention in violation of the Fourth Amendment;

(2)     The Court grants the motion to the extent it seeks dismissal of Plaintiff's Section 1983 claim for unlawful arrest in violation of the Fourth Amendment;

(3)     The Court grants the motion to the extent it seeks dismissal of Plaintiff's Section 1983 malicious prosecution claim in violation of the Fourth and Fourteenth Amendments;

(4)     The Court grants the motion to the extent it seeks dismissal of Plaintiff's Section 1983 claim for retaliatory arrest in violation of the First Amendment; and

(5)     The Court denies the motion to the extent it seeks dismissal of Plaintiff's Section 1983 claim for excessive force in violation of the Fourth Amendment.

IT FURTHER IS ORDERED that Defendant Robert Metzgar's Motion for Summary Judgment Based on Qualified Immunity and Supporting Memorandum, filed December 13, 2013

74

[Doc. 64], is GRANTED IN PART and DENIED IN PART as follows:

(1)    The Court denies the motion to the extent it seeks dismissal of Plaintiff's Section 1983 claim for unlawful investigative detention in violation of the Fourth Amendment;

(2)    The Court grants the motion to the extent it seeks dismissal of Plaintiff's Section 1983 claim for unlawful arrest in violation of the Fourth Amendment;

(3)    The Court grants the motion to the extent it seeks dismissal of Plaintiff's Section 1983 malicious prosecution claim in violation of the Fourth and Fourteenth Amendments;

(4)    The Court grants the motion to the extent it seeks dismissal of Plaintiff's Section 1983 claim for retaliatory arrest in violation of the First Amendment; and

(5)    The Court denies the motion to the extent it seeks dismissal of Plaintiff's Section 1983 claim for excessive force in violation of the Fourth Amendment.

IT ALSO IS ORDERED that Defendant Jeremy McRae and Defendant City of Albuquerque's Motion for Summary Judgment Requesting Dismissal of Count V of Plaintiff's Complaint—Supervisory and Municipal Liability, filed December 13, 2013 [Doc. 61], is GRANTED IN PART and DENIED IN PART as follows:

(1)    The Court denies the motion to the extent it seeks dismissal of Plaintiff's Section 1983 supervisory liability claim; and

(2)    The Court grants the motion to the extent it seeks dismissal of Plaintiff's Section 1983 municipal liability claim.

Dated this 29th day of September, 2014.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

75